Andrew G. Watters (#237990)
555 Twin Dolphin Dr., Ste. 300
Redwood City, CA 94065
andrew@andrewwatters.com
+1 (415) 261-8527

Attorney for Defendant
Simon Chan

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Simon Chan, Debtor | Case no. 18-40217CN7<br>A/P No. 18-04060 |
| MICHAEL SCOTT FRAZER, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>SIMON CHAN, et al.,<br><br>    Defendants. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: March 4, 2019<br>Time: 10:00 a.m.<br>Place: Oakland, Room 215 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................ iii

MEMORANDUM OF POINTS AND AUTHORITIES........................ 1

    INTRODUCTION........................................... 1

    FACTS.................................................. 5

    KEY LAW................................................ 9

    ARGUMENT............................................... 10

        I.    ALTHOUGH THIS COURT IS NOT A COURT OF APPEAL,
            IT IS STILL APPROPRIATE TO TAKE A SECOND
            LOOK AT THE JUDGMENT TO EVALUATE ISSUES
            THAT IMPACT NONDISCHARGEABILITY............. 10

        II.   THE U.S. TRUSTEE ACTED BEYOND HER AUTHORITY
            IN PURPORTING TO CONFESS JUDGMENT AGAINST
            DEFENDANT, INCLUDING PUNITIVE DAMAGES....... 11

        III. THE JUDGMENT IS DISCHARGEABLE DUE TO THE LACK
            OF A REPRESENTATION........................ 14

        IV.  THE JUDGMENT IS DISCHARGEABLE BECAUSE DEFENDANT
            CLEARLY BELIEVED THE REPRESENTATIONS WERE
            TRUE AT THE TIME THEY WERE MADE............ 19

        V.    THE JUDGMENT IS DISCHARGEABLE DUE TO THE
            LACK OF SCIENTER.......................... 21

        VI.  THE JUDGMENT IS DISCHARGEABLE DUE TO THE LACK
            OF JUSTIFIABLE RELIANCE..................... 21

        VII. THE JUDGMENT IS DISCHARGEABLE DUE TO THE LACK
            OF PROXIMATE CAUSE......................... 24

    CONCLUSION............................................. 25

Case: 18-04060   Doc# 44   Filed: 02/01/19   Entered: 02/01/19 16:39:27   Page 2 of 29

# TABLE OF AUTHORITIES

2   *Brown v. Felsen*, 442 U.S. 127 (1979)...................... 10–11

3   *Carey Lumber Co. v. Bell*, 615 F. 2d 370 (5th Cir. 1980).... 9

4   *Commonwealth of Mass. v. Hale*, 618 F. 2d 143 (1st Cir. 1980) 9

5   *Field v. Mans*, 516 U.S. 59 (1995)......................... 22

6   *Grogan v. Garner*, 498 U.S. 279 (1991)..................... 11

7   *In re Anastas*, 94 F. 3d 1280 (9th Cir. 1996).............. 21

8   *In re Apte*, 96 F. 3d 1319 (9th Cir. 1996)................. 9

9   *In re Bocchino*, 794 F. 3d 376 (3rd Cir. 2015)............. 10

10   *In re Bus Stop, Inc.*, 3 B.R. 26, 27 (Bkrtcy.S.D.Fla.1980).. 9

11   *In re Dakota*, 284 B.R. 711 (Bankr.N.D.Cal. 2002).......... 21

12   *In re Houtman*, 568 F. 2d 651 (9th Cir. 1978).............. 9

13   *In re James J. Stanton*, 121 B.R. 438 (S.D.N.Y. 1990)...... 12–13

14   *In re Kirsh*, 973 F. 2d 1454 (9th Cir. 1992)............... 9,23

15   *In re Lockwood*, 14 B.R. 374 (Bkrtcy.E.D.N.Y.1981)......... 10

16   *In re Overmyer*, 26 Bankr. 755 (Bankr.S.D.N.Y. 1982)....... 12

17   *Irwin v. City of Manhattan Beach*

18   (1964) 227 Cal. App. 2d 634............................... 13

19   *Lawrence T. Lasagna, Inc. v. Foster*, 609 F. 2d 392

20   (9th Cir. 1979).......................................... 9

21   *Matter of Kasler*, 611 F. 2d 308 (9th Cir. 1979)........... 9

22   *Romesh Japra, M.D., F.A.C.C., Inc. v. Apte*,

23   180 B.R. 223 (9th Cir. BAP 1995)......................... 22–23

24   *Valerio v. Andrew Youngquist Constr.*

25   (2002) 103 Cal. App. 4th 1264............................ 16–17

26

27

28

Case: 18-04060   Doc# 44   Filed: 02/01/19   Entered: 02/01/19 16:39:27   Page 3 of 29

1      **MEMORANDUM OF POINTS AND AUTHORITIES**

2                          **INTRODUCTION**

3          Although this Court has previously stated it will not

4      reexamine the state court's evidentiary findings, some form of

5      review of those findings in the context of the issues presented

6      here is clearly permitted by the Supreme Court, which holds that

7      state court judgments are not res judicata for the purposes of

8      nondischargeability.  This Court's authority to look beyond the

9      judgment to consider the issue of nondischargeability is clear

10     from multiple Supreme Court decisions that will be discussed.

11         This chart shows the basic problems with Plaintiffs' claims

12     in this matter:[1]



26     _____

27     1    The dates of investment are taken from Plaintiffs' own table
       of their investments (trial exhibit 4—Exhibit C to Mr. Watters's
       declaration).  The dates of the PPM's are taken from emails and
28     metadata discovered in David Tarnowski's document production.

Case: 18-04060    Doc# 44    Filed: 02/01/19    Entered: 02/01/19 16:39:27    Page 4 of 29

As shown, version 1A-1 did not have the disputed representations, and it was the only PPM in place when the first $325,000 was invested.  This final electronic file resulted from changes made to a merged Microsoft Word file edited by each of the principals, as described in Mr. Chan's and Mr. Watters's declarations.  The problem is that the version of the PPM that most of the Plaintiffs claimed at trial that they relied on when investing (2A-2) was not created by PPM author David Tarnowski until April 12, 2006, after most of the funds were invested. This version was also unauthorized and not approved by either Mr. Mugg or Defendant before being sent out.  And the version of the PPM produced by some of the Plaintiffs in discovery and attached to all of their operative complaints (1A-1) does not contain the disputed representations.  Even version 1A-2, which contains the disputed representations, was created on January 9, 2006 after the first half of the funds ($325,000) was invested. As to this $325,000 Plaintiffs cannot have relied on the disputed representations when considering their investment decisions, and as to the rest of the investment fund the elements of nondischargeability are seriously lacking.

The undisputed evidence shows that the final version of the PPM (1A-1) was the version provided to Plaintiffs before they invested their money.  An analysis of electronic metadata reveals that the supposedly "final" versions of the PPM complained of at trial were not created until January 9, 2006 and April 12, 2006, after at least half of the money was invested ($325,000). The first revised version of the PPM (1A-2) was not authorized by Gary Mugg or Defendant, but rather was given to some of the

Plaintiffs by David Tarnowski and backdated to December 20,
2005—conveniently before the remaining investment checks were
written.  As such, Plaintiffs not only <u>could not</u> have relied on
the claimed fraudulent representations before they invested half
their money, but they also <u>actively mis-remembered the facts</u>
to the trial court in claiming that they were defrauded by a
PPM that did not exist at the time half of their investments
were made.  To that end, the hard copy PPM produced by Bill
and Michelle Chan at trial was a complete untruth, in that the
Chans received this PPM from cross defendant David Tarnowski at
a breakfast meeting <u>after</u> they had invested their money—a fact
that the Chans clouded at trial when they expressly represented
to the trial court that their hard copy was what they relied
on when investing (and that it was identical to version 1A-1,
which is not the case).  In retrospect, the truth was clear from
the beginning: the final PPM that Plaintiffs relied on (1A-1)
when investing was the version attached to Plaintiff's Second
Amended Complaint, just as alleged in the complaint, although the
trial court made a completely contrary finding that was totally
unsupported by the evidence.

The truth was belatedly revealed not by Plaintiffs, but
by a single sentence in one email in Mr. Tarnowski's voluminous
document production of electronic data.  In that message, as
described in Mr. Watters's declaration, he tells several of
the Plaintiffs <u>after</u> most of their investments were made that
he is bringing a revised, hard copy, bound PPM to a breakfast
meeting.  This explains how Bill and Michelle Chan had a hard
copy PPM of version 1A-2 with the claimed fraud in it at the

Case: 18-04060   Doc# 44   Filed: 02/01/19   Entered: 02/01/19 16:39:27   Page 6 of 29

2017 trial.  Defendant never authorized, distributed, approved, or even reviewed version 1A-2 or 1A-4 (or 2A-2) of the revised PPM brought to Plaintiffs by Mr. Tarnowski, who was partners with some of the Plaintiffs in an unrelated business venture. So Defendant cannot possibly be liable for the contents of that PPM.  Even assuming, for the sake of argument, that Defendant's original representations to Mr. Mugg about his Chinese real estate experience were untrue, the fact that the representations could not have been relied on makes them a non-factor and a non-cause in Plaintiffs' investment decisions.  In other words, Plaintiffs were not told the claimed fraudulent representations before investing at least half their money, so they could not have relied on the representations.  As to the remaining funds, the PPM was unauthorized and unknown to Defendant, who cannot possibly be liable for any "indirect" fraud, of which he was unaware.  The representations were also not knowingly false.  At the very least, Defendant lacks the required scienter because Defendant's conduct was not "grossly reckless" with respect to the representations made, as that standard is described in the cases.  Nor did Defendant have any subjective intent to defraud Plaintiffs.  Because there is no scenario in which Plaintiffs can prove their case following the discovery of the forensic evidence, Defendant prays for a summary judgment in his favor on the operative complaint.  The operative complaint asserts a sole cause of 523(a)(2)(A) fraud against Defendant, following the dismissal of the fiduciary fraud claim.

This motion examines the factual background of the investment, the PPM, and the trial, the legal standard for

nondischargeability of fraud, and the logical conclusion that
Defendant should be discharged the state court judgment. As to
half of it, a discharge would reflect that half of the investment
funds were actually contributed before the revised PPM was
distributed by Mr. Tarnowski, and therefore there was no fraud
as to these funds. The other half of the judgment should also
be discharged, because Defendant never reviewed, approved, or
authorized the revised PPM distributed by Mr. Tarnowski, and so
Defendant lacked the required scienter, among other issues.

**FACTS**

**Introduction**

This action arises out of an investment program begun in
2005 by the late Gary Mugg, who was an attorney and occasional
investor. The investment program was expected to acquire and
hold real property in China leading up to the 2008 Olympics,
then sell the property for a profit. It is undisputed that
the program did not succeed and that it ran out of money after
partially building out the two apartments. The dispute in this
adversary proceeding centers on which version of the PPM the
Plaintiffs had when they invested their money, as well as the
contents of each version of the PPM and who is responsible for
them. The unequivocal forensic and documentary evidence shows
that Plaintiffs cannot have relied on the later PPM containing
the claimed fraud when they invested the first $325,000 of their
money. As to the remaining funds, the remaining elements are
lacking and Defendant also lacks the required scienter.

**The Initial Setup of the Investment**

In late 2005, Mr. Mugg and Mr. Tarnowski approached

Defendant, who was at that time living in China. Defendant, a native of Hong Kong, was permitted to hold property in mainland China because he was a dual citizen of Hong Kong and the U.S. Mr. Mugg formed Adept Properties, LLC and Dragonwood, LLC, both of which were for the purpose of furthering the investment program. Adept was the Manager of Dragonwood, and Mr. Mugg was the Manager of Adept. Defendant was not the Manager of either LLC. In any event, Mr. Mugg offered Defendant a property management fee and other compensation in return for holding the property in China on behalf of Adept. Defendant was an employee of Adept acting on its behalf, rather than a Manager of the LLC or an actual officer.

### The PPM and Investments

In December 2005, Mr. Mugg issued a private placement memorandum (PPM) written primarily by Mr. Tarnowski for the investment program. The final PPM (version 1A-1) <u>did not</u> contain any fraudulent representations, and it contained extensive warnings to the investors, such as a warning not to rely exclusively on the text of the PPM. The date of the final PPM was December 20, 2005 after Mr. Mugg emailed attorney Matteo Daste stating that he would immediately go to print and forego further discussion. Plaintiff Julie Lam had already invested much of her money before even seeing the PPM (her initial $100,000 investment was made in Adept on November 6, 2005). The other Plaintiffs invested in early January 2006, and throughout early 2006. The funds that were invested before the revised PPM (version 1A-2) was circulated amount to $325,000 (just under half of the $652,500 total) in the following amounts: Julie Lam for

1  $100,000 on November 6, 2005 (in Adept), Bill and Michelle Chan
2  for $75,000 on January 4, 2006, and Scott Frazer for $150,000
3  on January 4, 2006.  Two of the three Plaintiffs who received
4  the unauthorized revised PPM from Mr. Tarnowski on <u>January</u>
5  <u>9, 2006</u> had already paid their money, with the rest paid on
6  January 12, 2006 (Tom Velken—$75,000), February 20, 2006 (Alan
7  Miller—$75,000), May 13, 2006 (Julie Lam—$75,000), May 15, 2006
8  (Jeff Chang—$75,000), and May 12, 2007 (Julie Lam—$37,500).  In
9  other words, $325,000 was invested <u>before</u> the unauthorized PPM
10  was distributed, and $337,500 <u>after</u> the unauthorized PPM.

**The Lawsuit**

12      In the Second Amended Complaint, Plaintiffs assert fraud
13  against Defendant.  However, the PPM attached to the SAC does
14  not contain any of the representations that Plaintiffs complained
15  of at trial, which were the sole remaining representations
16  questioned by Plaintiff.  The version of the PPM attached to the
17  SAC (1A-1) is the final version of the PPM from December 20, 2005
18  as approved by Mr. Mugg and ratified by Defendant.

19      Despite being informed at trial and following the trial
20  that their trial testimony contradicted the judicial admission
21  in their complaint, Plaintiffs took no action to correct this
22  supposed error before, during, or after the trial.  This could
23  only be because the judicial admission in their operative
24  complaint is actually the truth; that the PPM Plaintiffs
25  received in December 2005 (1A-1) did not contain any fraudulent
26  representations.

**The 2017 Trial**

28      In the trial, the testimony revolved around the revised PPM

1   and its contents.  There were two versions claimed at trial to be
2   fraudulent: version 1A-2 and 2A-2.  1A-2 was created on January
3   9, 2006, and 2A-2 on April 12, 2006, <u>after</u> most of the Plaintiffs
4   invested their money.  Despite this, Plaintiffs steadfastly
5   claimed that they relied on these versions, and after the dates
6   were questioned, Mr. and Mrs. Chan claimed that the prior version
7   also contained the disputed representations.  That is not the
8   case, as described in the supporting declarations.  In any event,
9   in response to Defendant's proof and Plaintiffs' admission that
10  version 1A-1 of the PPM did not contain the claimed fraud,
11  Plaintiffs all testified that they relied on the revised PPM when
12  investing their money.  As discussed above, this is untrue for
13  at least $325,000 of the funds, and the remaining elements are
14  lacking for the rest of the funds in any event.

### Entry of Judgment

16      Pursuant to a stipulation between Plaintiffs and the U.S.
17  Trustee, this Court authorized the stay to be lifted for the
18  purpose of Plaintiffs pursuing a judgment.  Defendant objected
19  to this procedure as well as the substance of the agreement,
20  which violated his rights to due process under the state and
21  Federal constitutions.  Over Defendant's objections, the state
22  court entered a judgment on April 18, 2018 that included an award
23  of punitive damages.  Defendant appealed, but his appeal was
24  dismissed for lack of jurisdiction due to a supposed technicality
25  with the automatic stay.  That decision is not yet final due to
26  a petition for review with the California Supreme Court.  This
27  motion for summary judgment followed because there is no scenario
28  in which Plaintiffs can prevail due to the documentary evidence.

## KEY LAW

State Court judgments are <u>not</u> res judicata in a subsequent nondischargeability action in the bankruptcy court. *Commonwealth of Massachusetts v. Hale*, 618 F.2d 143 (1st Cir.1980); *In re Franklin*, 615 F.2d 909 (10th Cir.1980); *Carey Lumber Co. v. Bell*, 615 F.2d 370 (5th Cir.1980); *Matter of Kasler*, 611 F.2d 308 (9th Cir. 1979); *Lawrence T. Lasagna*, *Inc. v. Foster*, 609 F.2d 392 (9th Cir.1979); *In re Houtman*, 568 F.2d 651 (9th Cir.1978). See *Brown v. Felsen*, 442 U.S. 127 (1979) (Supreme Court unanimously held that a bankruptcy court may consider evidence extrinsic to the judgment and record of a prior state court suit when determining whether such a debt is dischargeable); *In re Lockwood*, 14 B.R. 374, 377-78, B.C.D. 128 (Bkrtcy.E.D.N.Y.1981); *In re Bus Stop*, *Inc.*, 3 B.R. 26, 27 (Bkrtcy.S.D.Fla.1980).

The standard for nondischargeability of fraud is found in 11 U.S.C. 523(a)(2)(A), as discussed in the matters of *In re Apte*, 96 F.3d 1319, 1322 (9th Cir. 1996) and *In re Kirsh*, 973 F.2d 1454, 1457 (9th Cir. 1992). A creditor must prove the following five elements to establish nondischargeability based on fraud: (1) a representation was made, (2) that the debtor knew to be false at the time it was made, (3) that the debtor made with the intention of deceiving the creditor, (4) on which the creditor justifiably relied, and (5) which proximately caused the creditor's damages. *In re Apte*, *supra*, at 1322. A reading of these authorities indicates that the "knowledge of falsity" element is essentially a requirement of scienter before a Bankruptcy court will decline to discharge a debt incurred through claimed fraud.

The minimum level of "knowledge" required to sustain a determination of nondischargeability is "gross recklessness" with respect to the truth of the representations made, although the Ninth Circuit has yet to weigh in on this issue. See, e.g., *In re Bocchino*, 794 F.3d 376, 382 (3rd. Cir. 2015) (scienter largely an issue of first impression).

**ARGUMENT**

**I.**

**ALTHOUGH THIS COURT IS NOT A COURT OF APPEAL, IT IS STILL APPROPRIATE TO TAKE A SECOND LOOK AT THE JUDGMENT TO EVALUATE ISSUES THAT IMPACT NONDISCHARGEABILITY**

This Court stated during a prior hearing that it was not a court of appeal and had no intention of revisiting the factual findings made by the trial court. While this Court is not a court of appeal, the cases as well as the available guidance from the Supreme Court do establish that the Bankruptcy Court may separately evaluate certain issues that may or may not have arisen at trial in order to determine nondischargeability, and further, may look at extrinsic evidence to do so because a state court judgment is not res judicata. See, e.g., *Brown v. Felsen*, 442 U.S. 127 (1979) (res judicata did not bar Bankruptcy Court from considering extrinsic evidence when evaluating nondischargeability of fraud claim, even one that was reduced to a judgment). "[T]he mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the true nature of the debt." *Brown* at 138. In addition, where a creditor fails to reduce his claim to a judgment before the petition is filed, the Bankruptcy Court

is <u>clearly</u> free to examine the facts under Federal standards to determine, independently, whether a discharge is proper. See, e.g., *Grogan v. Garner*, 498 U.S. 279 (1991) (creditor did not reduce claim to judgment before bankruptcy petition was filed, and was permitted to offer extrinsic evidence to the bankruptcy court to prove fraud). Complicating the issue is the authority of the U.S. Trustee, whom Defendant contends lacks the authority to stipulate to a judgment against the debtor without his consent, as well as an award of punitive damages made over the debtor's objections. All of these issues are appropriate for resolution in this Court pursuant to the Bankruptcy Code.

In this matter, the judgment was not obtained prepetition. It was obtained during the bankruptcy case through a questionable side deal between Plaintiffs and the U.S. Trustee, in which the U.S. Trustee stipulated to the judgment. This resulted in the award of punitive damages against Defendant without a trial on that issue—a violation of state law as well as the parties' pretrial stipulation to bifurcate punitive damages. This is a perfect situation for the Bankruptcy Court, acting as a safeguard on the U.S. Trustee's arguably reckless decision to stipulate to the judgment, to review the evidence independently and determine for good and all whether the judgment is dischargeable. The extrinsic evidence supports a discharge, as discussed at III. through VII. below and in the supporting declarations.

## II.

**THE U.S. TRUSTEE ACTED BEYOND HER AUTHORITY IN PURPORTING TO CONFESS JUDGMENT AGAINST DEFENDANT, INCLUDING PUNITIVE DAMAGES**

Defendant objected on due process grounds and misjoinder/

Case: 18-04060   Doc# 44   Filed: 02/01/19   Entered: 02/01/19 16:39:27   Page 14 of
29

capacity grounds to Respondents' stipulation for judgment, as well as the proposed judgment.  The objection was based primarily on Respondents' and the bankruptcy trustee's lack of capacity to confess judgment against Defendant.

The power to confess judgment under state law is personal to the judgment debtor and may not be exercised by any type of third party, including a bankruptcy trustee.  CCP sec. 1133 (writing authorizing entry of judgment upon a confession of judgment must be signed by the defendant and verified by his oath).  Although not, strictly speaking, a <u>confession</u> of judgment, the <u>stipulation</u> for judgment is the equivalent thereof, and the concept is the same.  In any event, a key case in this area is *In re James J. Stanton*, 121 B.R. 438 (S.D.N.Y. 1990).  In *Stanton*, a Chapter 7 debtor objected to a stipulation made by the trustee and his creditors to resume a state court action and allow it to proceed to judgment.  The court noted preliminarily: "the debtor may object to the court's approval of the stipulation, if such stipulation would adversely affect the debtor's personal interests."  *In re James J. Stanton*, 121 B.R. 438, 440 (1990).  It is well-settled that the trustee acquires the debtor's prepetition property interests as part of the concept of property of the estate as expressed in 11 U.S.C. § 541, because 11 U.S.C. § 323(a) declares that the trustee is the representative of the estate.  The trustee, however, does not represent the debtor's postpetition interests, nor does the trustee represent the debtor's personal involvement in objections to dischargeability filed by creditors pursuant to 11 U.S.C. § 523.  See *In re Overmyer*, 26 Bankr. 755 (Bankr. S.D.N.Y. 1982).  Therefore, the

Case: 18-04060   Doc# 44   Filed: 02/01/19   Entered: 02/01/19 16:39:27   Page 15 of
29

Chapter 7 debtor must have standing to object to a stipulation between his trustee and his creditors, which would authorize the continuance of a state court action against the debtor. *In re James J. Stanton*, 121 B.R. 438, 440 (1990). The question in such a case is whether the stipulation would subject the debtor to greater liability than he otherwise would face. *In re James J. Stanton*, 121 B.R. 438, 442 (1990).

Here, the stipulation for judgment includes an award of punitive damages, which violates the parties' stipulation to bifurcate punitive damages as well as Defendant's statutory right to a bifurcated trial on punitive damages under the California Civil Code. The stipulation therefore exposes Defendant to greater personal liability than he would otherwise have, and also punitive damages based on fraud are not dischargeable.

The stipulation for judgment here did not merely lift the stay for the action to proceed; it went further and allowed entry of judgment and punitive damages against Defendant without due process. The trial court was without authority to render a judgment that materially affected the rights of absent, known, and indispensable parties. Defendant was an indispensable party on the stipulation for judgment because the right to confess judgment is personal to the judgment debtor under CCP sec. 1133. The Plaintiffs argued that Defendant did not object to their stipulation in bankruptcy court. However, failure of a litigant to question the jurisdiction of the court to render a judgment cannot vest in the court a power which the law denies. *Irwin v. City of Manhattan Beach* (1964) 227 Cal. App. 2d 634, 637 (indispensable party). In this way, Defendant's consent was not

Case: 18-04060   Doc# 44   Filed: 02/01/19   Entered: 02/01/19 16:39:27   Page 16 of 29

given to the stipulated judgment against him, and it must be discharged because his consent was required.

### III.

**THE JUDGMENT IS DISCHARGEABLE DUE TO THE LACK OF A REPRESENTATION**

#### A. The Final PPM vs. The Unauthorized PPM

The testimony at trial revolved around Mr. Chan's real estate experience in China stated in versions 1A-2 and 2A-2 of the PPM (trial exhibits 3 (2A-2) and 58 (1A-2)). There were multiple versions of the PPM, some of which did not contain the purported fraudulent representations (i.e., version 1A-1). Whether these statements are even false, much less materially false, is debatable. But in any case, Plaintiffs could not point to any false statements in Mr. Chan's resume/c.v. or anywhere else that Mr. Chan may have contributed to the PPM. Thus, the only claim of fraud presented at trial and remaining at issue relates to the statements of Mr. Chan's Chinese real estate experience in the PPM. Mr. Chan testified that he had a minimal role in the preparation of the PPM, and that Mr. Mugg was the one calling the shots as to its content and preparation. In any case, the timeline chart provided above and the supporting declarations show that the representations did not appear in the final PPM, and were only added by Mr. Tarnowski when he was sharing a subsequent, unauthorized version of the PPM with some of the Plaintiffs, who were his then-business partners.

The role of Defendant in preparing the PPM was corroborated to some degree by Plaintiffs' own testimony, e.g., R.T. 374:14-20 (Plaintiffs have no evidence that Mr. Chan prepared any portion of the PPM besides his real estate experience from version 1A-2)

(Exhibit A to Mr. Watters's declaration).  See also, e.g., R.T. 389:27-391:2 (Mr. Mugg gave the instructions for how and where to write the investment checks).  Mr. Tarnowski conceded that he co-wrote the PPM and was the "wordsmith" for it.  R.T. 26:15-27:1.  Plaintiffs did not rebut this evidence (in fact, Plaintiffs had called Mr. Tarnowski).  Mr. Chan subsequently clarified at trial the representations made in the revised PPM, which are, at worst, two-thirds true.  R.T. 572:9-21.  Mr. Chan was involved in all of the transactions he listed in the PPM; the only question is how involved.  Clearly, Mr. Chan was entitled to say he was involved in some fashion, and that is what a reasonable person in Plaintiffs' position would understand from the statements in the PPM.  Plaintiffs conceded that they had opportunities to ask the principals questions about the contents of the PPM, and presumably nothing prevented them from doing so.  R.T. 267:9-12.  Plaintiffs also conceded they were aware of and understood <u>all</u> of the warnings in the PPM, including the warning not to rely exclusively on the text of the PPM.  R.T. 267:2-4.

But separate and apart from the truth of the statements in the PPM, the key fact on the fraud cause is that the claimed fraudulent representations <u>do not</u> appear in the PPM that is attached to Plaintiffs' operative complaint and that they alleged they were defrauded by.  R.T. 260:17-262:2 (Mr. Frazer admits the PPM attached to his complaint does not contain the disputed section).  There was a stipulation that each Plaintiff attached that same PPM to his or her complaint as well.  R.T. 336:1-11.  There are no allegations in the operative complaint that the particular statements complained of at trial are fraudulent.

See, e.g., Second Amended Complaint at para. 56 (Exhibit E to Mr. Chan's declaration).  The operative complaint goes to great lengths to complain of fraud and other supposed misdeeds by Mr. Chan, but <u>none</u> of the many allegations therein are directed at Mr. Chan's Chinese real estate experience in the PPM that Plaintiffs complained of so vociferously at trial.  Plaintiffs had the opportunity to seek leave to amend upon "discovering" this supposed mistake during trial, but they failed to do so.  Plaintiffs also did not seek leave to amend to conform to proof after the trial.  That is two opportunities during and after trial to correct the supposed error, both of which Plaintiffs did not take.  This could only be because the admission in the complaint is actually the truth.  This admission is supported by a series of email messages between Mr. Mugg and Mr. Tarnowski, as well as an email from Mr. Tarnowski to some of the Plaintiffs after half of the money was invested.  This series of emails is outlined in Mr. Watters's declaration and shows that Plaintiffs could not have had the "revised" PPM (versions 1A-2 and 2A-2) at the time they invested the first half of the investment fund.  As to the second half of the investment fund, Defendant never authorized or reviewed that version of the PPM and had no knowledge it was being sent.

The rule is that where a judicial admission conflicts with trial testimony, the Court is bound by the judicial admission. *Valerio v. Andrew Youngquist Construction* (2002) 103 Cal. App. 4th 1264, 1271-1272.  This is because a judicial admission is a conclusive concession of the truth of a matter and removes that matter from the issues for trial.

Case: 18-04060   Doc# 44   Filed: 02/01/19   Entered: 02/01/19 16:39:27   Page 19 of 29

In *Valerio*, a painter worked on a painting project on behalf of a general contractor, and testified at trial that he did so without a written contract. The written contract would have made the painter liable for additional work occasioned by his failure to perform, and also would have affected the painter's cause for quantum meruit. In the painter's answer to the complaint, he admitted that there was a written contract in the form claimed by the general contractor. The Court of Appeal discussed the nature and extent of judicial admissions and their effects, before ordering a new trial for the general contractor with the issue of the written contract deemed conclusively established by the admission in the answer. The *Valerio* case is important because it shows how conclusive judicial admissions are: completely conclusive. The judicial admissions here——that the PPM Plaintiffs received and relied on is the PPM attached to their complaint, and that the PPM does not contain the claimed fraudulent representations——should be found binding on Plaintiffs, irrespective of any evidentiary showing in this motion by Defendant.

The Court should note with great importance that Plaintiffs' testimony conflicts with their operative complaint, leave to amend was not sought during or after the trial, and no explanation was given for the failure to seek amendment. The Court should adopt the position taken in the complaint——that the statements complained of at trial were not in the 1A-1 PPM that Plaintiffs actually relied on when investing their money.

The statements complained of at trial were in an unauthorized, un-reviewed PPM that David Tarnowski separately

printed and bound for several of the Plaintiffs whom he met
at a breakfast meeting in early January 2006.  Mr. Tarnowski
was partners with several of the Plaintiffs in an unrelated
venture, perhaps explaining why he felt he had the authority
to deviate from Mr. Mugg's direction.  In any case, Mr. Chan
did not approve, review, or even see the revised PPM before it
was printed for the breakfast meeting.  He had no knowledge
concerning the use of his Chinese real estate experience in
the unauthorized PPM.  Further, the absence of the experience
from the final PPM following Mr. Chan's prior request for Mr.
Tarnowski not to use the experience in the PPM left Mr. Chan
believing that his request had been honored.  All of this points
to a lack of a false representation for Plaintiffs to rely on,
which negates the very first element of their fraud claim.

**B.  The Plaintiffs' Investments vs. Which PPM they Had**

The Plaintiffs here had different versions of the PPM, some
of which contained Defendant's Chinese real estate experience and
some of which did not.  The following chart, based on documentary
evidence produced by cross defendant David Tarnwoski, shows which
version of the PPM each Plaintiff had at the time of his or her
investment, contrasted with what was produced in discovery and
with their trial testimony:[2]

| Plaintiff | Amount of Investment by This Plaintiff | Date of Plaintiff's Investment | Version of PPM Had at Time of Investment | Version of PPM in Document Production | Version of PPM Claimed at Trial |
|---|---|---|---|---|---|
| Julie Lam | $100,000 (Adept) | Nov. 6, 2005 | None | 1A-1 | 2A-2 |
| Scott Frazer | $150,000 | Jan. 4, 2006 | 1A-1 | None | 2A-2 |

[2]   The backup evidence for this information is provided in Mr.
Chan's supporting declaration.

Case: 18-04060   Doc# 44   Filed: 02/01/19   Entered: 02/01/19 16:39:27   Page 21 of 29

| Plaintiff | Amount of Investment by This Plaintiff | Date of Plaintiff's Investment | Version of PPM Had at Time of Investment | Version of PPM in Document Production | Version of PPM Claimed at Trial |
|---|---|---|---|---|---|
| Bill and Michelle Chan | $75,000 | Jan. 4, 2006 | 1A-1 | 1A-4 | 1A-2 (printed) |
| Tom Velken | $75,000 | Jan. 12, 2006 | 1A-4 | 1A-4 | 2A-2 |
| Alan Miller | $75,000 | Feb. 20, 2006 | 1A-1 | None | 2A-2 |
| Julie Lam | $75,000 | May 13, 2006 | 1A-1 | 1A-1 | 2A-2 |
| Jeff Chang | $75,000 | May 15, 2006 | 1A-1 | 1A-1 | 2A-2 |
| Julie Lam | $37,500 (Adept) | May 12, 2007 | 1A-1 | 1A-1 | 2A-2 |
| Total: | $662,500 | | | | |

## C. Plaintiffs Never Communicated With Defendant Prior to Their Investments

Julie Lam states she met Mr. Chan at some point prior to her investments, though there was no fraud described in this initial meeting. R.T. 391:3-26. She states she did speak with Mr. Chan in 2007, though this was <u>after</u> her initial investment and well <u>after</u> receiving version 1A-1 of the PPM. R.T. 392:24-394:14. The other Plaintiffs each conceded they never met or communicated with Mr. Chan prior to their investments. See, e.g., R.T. 339:2-12 (Michelle Chan). Thus, the only representations at issue in the trial were Mr. Chan's Chinese real estate experience, which only appear in the unauthorized PPM given to Plaintiffs by David Tarnowski as version 1A-2 and 1A-4, and later 2A-2 (not given to the Plaintiffs by Mr. Tarnowski). This once again negates the element of a false representation because the statements were simply not made.

### IV.

### THE JUDGMENT IS DISCHARGEABLE BECAUSE DEFENDANT CLEARLY BELIEVED THE REPRESENTATIONS WERE TRUE AT THE TIME THEY WERE MADE

**A.  David Tarnowski Invites Defendant to Share his Qualifications**

Mr. Tarnowski sent Defendant an email message in late 2005 seeking Defendant's qualifications and experience with Chinese real estate, though Mr. Mugg did not explain what it was for. Defendant responded with a list of transactions in which he was involved while in China, which was produced as DT105—the core of Plaintiffs' fraud case (Exhibit G to Mr. Chan's declaration).

Defendant was involved in all of the transactions listed in his Chinese real estate experience; the only question is *how* involved.  In three or four of the deals, Defendant's family members provided the purchase money and obtained the proceeds; Defendant helped facilitate the transactions, but he did not personally invest his own money, or receive a share of the proceeds.  Two of the deals ultimately fell through, though this was <u>after</u> Defendant supplied his qualifications to Mr. Tarnowski. In other words, the information was true at the time, and Defendant believed it was true, when he supplied the information to Mr. Tarnoski.  At worst, it turned out to be two-thirds true, even after the two failed transactions fell through.  This is not intentional fraud as contemplated in a nondischargeability case, and is another reason why this Court should look beyond the judgment to evaluate what actually happened.

**B.  Defendant Instructs Tarnowski not to Put the Qualifications
in the Final PPM**

Defendant testified that he instructed Mr. Tarnowski not to put his Chinese real estate qualifications in the final PPM.  The qualifications do not appear in the final PPM (1A-1).  Thus, Mr. Tarnowski must have followed the instruction from Defendant (or

Mr. Mugg).  Subsequent versions of the PPM were not authorized by Mr. Mugg, or known to Defendant, and Defendant could not be liable for fraud of which he was unaware.

**V.**

**THE JUDGMENT IS DISCHARGEABLE DUE TO THE LACK OF SCIENTER**

**A.  Defendant did not Intend to Defraud Plaintiffs When he Responded to David Tarnowski**

The standard is whether the debtor "knowingly" intended to deceive the creditor.  Under Section 523(a)(2)(A), the creditor must show <u>actual</u> intent, not merely intent implied in law, or constructive intent.  *In re Dakota*, 284 B.R. 711, 721 (Bankr.N.D.Cal. 2002) (citing to *In re Anastas*, 94 F.3d 1280 (9th Cir. 1996)).  Gross recklessness appears to suffice for the intent element.

Here, there was no actual intent to defraud, or gross recklessness.  Defendant provided what he believed was accurate information to Mr. Tarnowski regarding his Chinese experience. He was not grossly reckless with respect to the representations made, to the extent any representations were made.  He denies being negligent, but the worst case scenario here is that Defendant was negligent as to what would happen with the information.  Negligent misrepresentation—though denied by Defendant here—is still dischargeable because it rises to a lower level than gross recklessness.

**VI.**

**THE JUDGMENT IS DISCHARGEABLE DUE TO THE LACK OF JUSTIFIABLE RELIANCE**

//

### A. Plaintiffs Could not Have Relied on Representations They Did not See

The Supreme Court has held that a creditor's reliance on a debtor's misrepresentation must be actual and justifiable, if not reasonable, to except a debt from discharge under 523(a)(2)(A). *Field v. Mans*, 516 U.S. 59 (1995). The Court explained that the general understanding of fraud, as expressed in the Restatement (Second) of Torts and by legal scholars, favors a justifiable reliance standard, which turns on a person's knowledge under the particular circumstances. "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." Id. at 71 (quoting Restatement (Second) of Torts § 545A cmt. b (1976)). "The Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" Id. at 70 (quoting Restatement (Second) of Torts § 540 (1976)).

Prior to the Supreme Court's decision in *Field v. Mans*, the Ninth Circuit repeatedly held that creditors must prove "justifiable reliance" in exception to discharge cases. See *In re Kirsh*, 973 F.2d 1454, 1458–1460 (9th Cir.1992). In *Romesh Japra, M.D., F.A.C.C., Inc. v. Apte (In re Apte)*, 180 B.R. 223 (9th Cir. BAP 1995), the Bankruptcy Appellate Panel explained the meaning of justifiable reliance:

//

> The general rule is that a person may justifiably
> rely on a representation even if the falsity of
> the representation could have been ascertained
> upon investigation.  In other words, negligence in
> failing to discover an intentional misrepresentation
> is no defense.  However, a person cannot rely on a
> representation if he knows that it is false or its
> falsity is obvious to him.  In sum, although a person
> ordinarily has no duty to investigate the truth of
> a representation, a person cannot purport to rely on
> preposterous representations or close his eyes to avoid
> discovery of the truth.

*In re Apte*, *supra*, at 229.

Here, there is a willful blindness in Plaintiffs to all the risks of the investment, because they were seeing dollar signs in China.  Even when the venture did not look like it would raise the millions of dollars sought by the promoters, Plaintiffs still wrote their checks.  When they were invited to ask questions of the principals, Plaintiffs declined to do so although they did request some additional information.  What happened is that Defendant became the scapegoat for Plaintiffs to latch on to, more than anything else.  In addition to no actual reliance on the representations (because they were not included in the final PPM), the reliance was not justifiable.  As shown by the fact that half of the investment fund was contributed following receipt of the final PPM that did not contain the claimed fraud, Plaintiffs would have invested their money whether Defendant's Chinese real estate experience was included or not included in the PPM.  This is not reliance, much less actual, justifiable reliance.  Defendant should be discharged the judgment due to the lack of reliance in addition to the lack of scienter.

//

//

**VII.**

**THE JUDGMENT IS DISCHARGEABLE DUE TO THE LACK OF PROXIMATE CAUSE**

    **A.  The Extensive Warnings in the PPM Qualified All of the Claimed Representations, and Plaintiffs Read and Understood Them**

      Plaintiffs each conceded that they knew they might be required to bear the risk of loss indefinitely and/or be stuck with the property indefinitely. R.T. 268:5-12 (Scott Frazer); 332:11-21 (Michelle Chan); 337:20-24 (stipulation that all of the Plaintiffs read and understood the same risk factors stated in the PPM). Plaintiffs were, in fact, stuck with the property indefinitely— a risk they agreed to assume. Rather than dissolve the LLC or collect on the Adept note, Plaintiffs sued Defendant as a shortcut for getting their money back. The fact that they succeeded in persuading the trial court with their poor memories as to which PPM they relied on makes it all the more important that this Court takes a stand and resolves the issue of nondischargeability appropriately.

    **B.  The Plaintiffs Failed to Take Action on the Adept Note, and Failed to Follow the Dissolution Procedure for the LLC**

      One of the long-simmering issues in this proceeding is an issue of standing. Respondent Scott Frazer testified that the Respondents did not follow the procedure described in the operating agreement when seeking their money back. R.T. 305:5-311:15 (lengthy discussion among the court, witness, and counsel regarding dissolution of the LLC). In addition, there is no cause of action for dissolution of either LLC in the operative complaint. Nothing prevented Respondents from pursuing dissolution of the LLCs, and this is both a contractual problem

1 and a statutory problem; it should be noted that the remedy for
2 corporate deadlock in a LLC is dissolution under the law, namely
3 Corp. Code sec. 17707.03, or else a vote of the members under
4 Corp. Code sec. 17707.01. Respondents held the majority of
5 interests in Dragonwood, so they certainly could have dissolved
6 the company upon a simple vote. Or if Gary Mugg resisted as
7 Manager, the members could have sued. They didn't. Defendant
8 had nothing to do with this decision to take a "wait and see"
9 approach, further demonstrating that Respondents are the ones who
10 should bear the loss here.

CONCLUSION

12      This is a case of an investment simply not panning out,
13 and Plaintiffs seeking their money back rather than holding the
14 investment as they agreed or dissolving the LLC as they agreed.
15 They were able to confuse the trial court as to the versions
16 of the PPM they relied on, but the evidence discussed herein
17 and in the supporting declarations clearly establishes what
18 actually happened. Defendant's purported representations do
19 not appear in the official, final PPM (1A-1), are not materially
20 false, were not made at all as to at least half the investment
21 fund ($325,000), were not actually and justifiably relied on
22 when the Plaintiffs invested their funds, and did not cause the
23 investments to occur. The remaining representations (to the
24 extent any were made) in versions 1A-2, 1A-4, and 2A-2 were not
25 made by Defendant, were not known to Defendant, and were not
26 approved or even authorized by the manager of the venture. As
27 such, the debt was not incurred by fraud under 523(a)(2)(A).
28 //

Case: 18-04060   Doc# 44   Filed: 02/01/19   Entered: 02/01/19 16:39:27   Page 28 of
29

Date: February 1, 2019

*Andrew G. Watters*

_____
Andrew G. Watters, Esq.
Attorney for Defendant Simon
Chan

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28