```
 1   CASE NUMBER:              CIVMSC14-00633
 2   CASE NAME:                FRAZER vs. CHAN, et al.
 3   MARTINEZ, CALIFORNIA      TUESDAY, JULY 18, 2017
 4   DEPARTMENT 33             HON. STEVEN K. AUSTIN
 5   REPORTER:                 APRIL D. HEVEROH, CSR #8759
 6   TIME:                     10:08 A.M.
 7                         ---oOo---
 8
 9                      P R O C E E D I N G S
10           THE BAILIFF:  Please remain seated and come to
11   order.  Department 33 is now in session.
12           MR. KILLIAN:  Okay.
13           Okay.  We're ready to go forward now.
14           THE COURT:  Okay.  Good morning, everybody.
15           ALL:  Good morning, Your Honor.
16           THE COURT:  All right.  So where were we?  We
17   still had --
18           MR. WATTERS:  I believe the cross-defendants
19   have a motion for non-suit, Your Honor.
20           THE COURT:  Oh, okay.  Do you want to come up
21   and do that?
22           MR. KILLIAN:  Yes, Your Honor.  I prepared the
23   documents.  Do I file them here, or do I --
24           THE COURT:  I looked through the transcript,
25   and -- yeah, you have some documents?
26           MR. KILLIAN:  Yes, Your Honor.  I wasn't sure
27   if I filed them here or downstairs.
28           THE COURT:  What were the documents?
```

Case: 18-04080   Doc# 47-5   Filed: 02/04/19   Entered: 02/04/19 06:37:11   Page 1 of 10

```
 1  local school districts?
 2      A.  Well over $100,000.
 3      Q.  Now, how did you first find out about this
 4  investment opportunity?
 5      A.  I met with David Tarnowski, Bill Chan and Tom
 6  Velken at the Squirrel Restaurant, and my guess is it
 7  was December of 2005.  And we were also in an
 8  electronics business at the time, starting that up, and
 9  Mr. Tarnowski described his investment to us.
10      Q.  How did he describe it?
11      A.  As a short-term real estate investment that was
12  going to be purchased, built out, rented and sold in
13  time for the Beijing Olympics.  He thought the return on
14  investment would be extremely favorable.
15      Q.  And in connection with that, did you receive a
16  PPM?
17      A.  Yes, sir, I did.
18      Q.  Can you look at Exhibit 58?
19      A.  Yes, sir.
20      Q.  And what is Exhibit 58?
21      A.  58 is the PPM dated December 20th, 2005.
22      Q.  Is this the document that you received?
23      A.  It appears to be.  I know that was the date on
24  my PPM, so it does appear to be, yes.
25      Q.  And did you review the PPM?
26      A.  Back then?
27      Q.  Yes.
28      A.  Yeah, absolutely.  Yes, sir.
```

1   Q.   And when you say review it, did you go through
2   it page by page?
3   A.   Yes, sir.
4   Q.   And did you talk to Mr. Tarnowski about the
5   PPM?
6   A.   Over several meetings, yes, we did.
7   Q.   Did you have questions about the investment?
8   A.   Yes.
9   Q.   What sort of questions did you have?
10  A.   Well, I had never invested in real estate in
11  China before, so I wanted to hear more about the
12  environment, the real estate environment in Beijing,
13  more specifically why he felt it was a hot real estate
14  market at the time.
15       I wanted to know more about Simon Chan, who was
16  obviously going to be the guy on the ground there as
17  spelled out in the PPM.  A little bit about Gary Mugg,
18  as well, since he was the local guy that would be
19  handling the U.S. side, but that wasn't as big a deal to
20  me as the other two.
21  Q.   And what did you understand the entity was that
22  you were going to be investing in?
23  A.   It was going to be an LLC called Dragonwood,
24  LLC.
25  Q.   Who was going to be the manager of that?
26  A.   There were three managers, to my understanding.
27  Initially, it was going to be Gary Mugg operating the
28  United States side, Simon Chan operating in Beijing as

```
 1  the operations guy on the ground there building and
 2  furnishing the units, and David, I'm not quite so sure
 3  after his initial role in bringing in investors.
 4      Q.  And if you look on page 3, it references Adept
 5  Properties, LLC.  Do you see that?
 6      A.  On page 3?
 7      Q.  On page 3 under the --
 8      A.  Yes, I see it's managed by, right.  Correct.
 9      Q.  Yes.  And did you come to understand that the
10  manager was going to be Adept Properties?
11      A.  Correct.
12      Q.  And that, then, who were the officers of Adept
13  Properties?
14      A.  The three aforementioned, Simon Chan, Gary Mugg
15  and David Tarnowski.
16      Q.  And I'd like you to focus just for a moment on
17  page 14 of the PPM.
18      A.  Yes, sir.
19      Q.  And did you read that with respect to Simon
20  Chan?
21      A.  Yes, I did.
22      Q.  And what was your reaction to that?
23      A.  Well, he sounded like the guy we needed on the
24  ground.  He had experience investing in Beijing,
25  successful experience.  He also had several properties
26  that he owned, so I felt he was actually a wealthy
27  investor himself in Beijing.  Sounded like the type of
28  person you would want to do this.
```

1   Q.   And did you discuss Simon Chan with
2  Mr. Tarnowski?
3       A.   Yes, I did.
4       Q.   And did he do -- was there anything about what
5  he told you that was at odds with what was in the PPM?
6       A.   At odds?  No.
7       Q.   Did it confirm the PPM?
8       A.   It confirmed the PPM, yes.
9       Q.   Now, let's go ahead and take a look at pages
10 6 and 7 of the PPM.  And specifically, the investment
11 experience of the manager.  Do you see that?
12      A.   Yes, sir.
13      Q.   At the bottom?
14      A.   Yes, sir.
15      Q.   Did you review that?
16      A.   Yes, I did.
17      Q.   Was that an important factor in your investment
18 decision?
19      A.   Well, it sort of confirmed what we were told,
20 was that he had tremendous experience and success in
21 investing in Beijing, yes.
22      Q.   Did you understand that Mr. Chan had purchased
23 the properties referenced there?
24      A.   Yes.
25      Q.   Have you come to learn that materials on page
26 6 and 7 are different than as stated?
27      A.   I'm sorry.  Can you repeat that, sir?
28      Q.   Sure.  Have you come to learn that Mr. Chan's

```
 1      Q.  The email I want to ask you about is the quoted
 2  message from you to the plaintiffs in this case.  Do you
 3  see that?
 4      A.  So the bottom, yes.
 5      Q.  Is it fair to say this is a prepared timeline
 6  that you prepared for the plaintiffs?
 7      A.  Yes, it is.
 8      Q.  Under 2012 on page 2 it indicates that you
 9  found out the units were in Simon's name under the 2012
10  section, right?
11      A.  Right.
12      Q.  So you're saying that in 2012 was the first
13  time you learned the units were in Simon's name?
14      A.  We learned that they were -- in 2012 that it
15  was in his name alone and that we had no signed
16  agreement to -- that would transfer that ownership to
17  Dragonwood.
18      Q.  Why was this agreed-upon version of the
19  timeline prepared?
20      A.  I'm sorry.  Say it again.
21      Q.  Why was this shared timeline prepared?
22      A.  Oh, why was it prepared?  We were trying to --
23  that was the beginning of our lawsuit, and I just
24  thought it would be helpful if I put together sort of a
25  rough skeleton, I called it, timeline, and the hope was
26  that people would be able to fill in other times and
27  dates.  There are some mistakes in it.  Some of the
28  dates are incorrect.  But it was a first stab.
```

|   |   |
|---|---|
| 1 | MR. WATTERS: The Evidence Code doesn't require |
| 2 | me to show him the document before he answers, Your |
| 3 | Honor. |
| 4 | THE COURT: Oh, okay. All right. So do you |
| 5 | know? Any idea? |
| 6 | THE WITNESS: I don't know one way or the |
| 7 | other, sir. |
| 8 | MR. WATTERS: I'd be happy to show him the |
| 9 | document, as well. |
| 10 | THE COURT: Pardon? |
| 11 | MR. WATTERS: I'd be happy to show him the |
| 12 | document now that he's answered, Your Honor. |
| 13 | THE COURT: Sure. Go ahead. |
| 14 | MR. WATTERS: May I approach, Your Honor? |
| 15 | THE COURT: Yeah. |
| 16 | BY MR. WATTERS: |
| 17 | Q. Mr. Frazer, you can take all the time you want. |
| 18 | Please take a look at Exhibit A to your second amended |
| 19 | complaint. |
| 20 | A. Okay. |
| 21 | Q. Let me know when you're ready to talk about it, |
| 22 | please. |
| 23 | A. Go ahead. |
| 24 | Q. Do you see any section in the PPM attached to |
| 25 | your complaint that goes over manager's direct |
| 26 | experience in the real estate market? For your |
| 27 | reference, that's on page 6 of Exhibit 58 if you'd like |
| 28 | to compare the two. |

A.   This version does not seem to have that section.
    Q.   In the complaint you allege that you were defrauded by the PPM that was attached to the complaint. Is that true?
    A.   Nope.
    Q.   That's not true?  Where does it --
    A.   No.  I said that it was the one that I received.  Not this one.  I don't know what this is.
    Q.   Does it not say in your complaint that you received that version of the PPM and relied on it in making your investment?
    A.   I have no idea.  The attorney wrote this, so I don't know.  Because it's not the document that I received.  That's all I can tell you.
    Q.   So there's an inaccuracy in the complaint over which document you received that you relied on?
    A.   That's possibly true.
    Q.   You don't know either way?
    A.   I don't know.  I can tell you that the one I have has that listed in it, and this one that you're showing me does not.  That's all I can tell you.
    Q.   You're saying that the PPM you received before you invested in Dragonwood contained the section on Mr. Chan's direct experience in the real estate market?
    A.   Absolutely.
    Q.   You were relying on your attorney to prepare the complaint, is that fair?

```
 1      A.   That's fair.
 2      Q.   Do you understand that you're still responsible
 3  for the allegations in the complaint?
 4           MR. WALSH:  Objection.  Argumentative.
 5           THE COURT:  Sustained.
 6  BY MR. WATTERS:
 7      Q.   In any event, you read the version of the PPM
 8  that you received before you invested, correct?
 9      A.   Yes.  Yes, I did.
10      Q.   Including all the warnings, correct?
11      A.   Yes.
12      Q.   You read it page by page; is that right?
13      A.   I did.
14      Q.   You understood that the investment money would
15  initially be placed in a segregated escrow account,
16  correct?
17      A.   Correct.
18      Q.   That's on page 10 under the offering.  I mean
19  page 9 under the offering.  There was no statement
20  anywhere in the PPM that the funds would always be held
21  in a segregated account, correct?
22      A.   That is correct, although I believe there was
23  some language as to that they would not be commingled, I
24  believe, is all it said.
25      Q.   What did you expect to happen to your
26  investment money once you invested it?
27      A.   I expected the money to be wired to China in
28  order to purchase the real estate.
```

|  |  |  |
|---|---|---|
| 1 | A. | Correct. |
| 2 | Q. | You understood that the PPM was not to be the |
| 3 | sole basis for your investment decision, correct? | |
| 4 | A. | Correct. |
| 5 | Q. | You understood that it was up to you to obtain |
| 6 | your own legal or financial advice before investing, | |
| 7 | correct? | |
| 8 | A. | Correct. |
| 9 | Q. | You understood that you had the opportunity to |
| 10 | ask Mr. Mugg or the other principals any questions you | |
| 11 | wanted before investing, correct? | |
| 12 | A. | Correct. |
| 13 | Q. | A further explanation of each risk factor |
| 14 | appears on page 21 through 23, correct? | |
| 15 | A. | Correct. |
| 16 | Q. | You understood that the properties might not be |
| 17 | able to be rented or resold, correct? | |
| 18 | A. | Correct. |
| 19 | Q. | You understood that the company might not be |
| 20 | able to find tenants or buyers for the properties, | |
| 21 | correct? | |
| 22 | A. | Correct. |
| 23 | Q. | ==So you understood that the company might be== |
| 24 | ==stuck with the properties indefinitely, correct?== | |
| 25 | A. | ==Correct.== |
| 26 | Q. | I'm sorry? |
| 27 | A. | Yes, correct. |
| 28 | Q. | Is that not the situation we find ourselves in |