1    question?

2         Q.    It attaches a version of the PPM, right?

3         A.    Yes.

4         Q.    It attaches a version of the subscription

5    agreement, right?

6         A.    It appears to, yes.

7         Q.    The email refers to a discussion regarding

8    changes to the previous version of the PPM, right?

9         A.    Yes, it does.

10        Q.    You, in fact, requested changes to the PPM,

11   right?

12        A.    I did not, no.

13        Q.    You were part of the discussions about changes,

14   right?

15        A.    Yes.

16        Q.    I take it you're saying that the Exhibit 58 was

17   the version that you received prior to your investment,

18   right?

19        A.    Yes, sir, that is correct.

20        Q.    Was there not a subsequent version of the PPM

21   after the version that you based your investment on?

22        A.    There was a subsequent version in early January

23   that I was aware of.

24        Q.    Exhibit 3, right?

25        A.    Let me look at Exhibit 3.  What is the date on

26   it?

27        Q.    January 2010, 2006.

28        A.    Yes, that would be right.

Case: 18-04000   Doc# 47-7   Filed: 02/04/19   Entered: 02/04/19 06:37:11   Page 1 of
5

```
1       Q.   This is the version of the PPM that attaches
2   the legal opinion, correct?
3       A.   Let me look.
4            Yes, I see the legal opinion.
5       Q.   So we've covered the PPM and the
6   representations made therein.  I need to ask you, what
7   other representations did my client make to you that you
8   later learned were untrue?  If any?
9            MR. WALSH:  Objection.  Vague as to time.
10           THE COURT:  Do you want --
11           MR. WATTERS:  I'll rephrase the question, Your
12  Honor.
13      Q.   Do you have any evidence suggesting that
14  Mr. Chan contributed to any portion of the PPM besides
15  his bio and the section on his Beijing experience?
16      A.   Did I personally have any knowledge that he
17  did?
18      Q.   Right.
19      A.   No, I don't.  I've seen emails where he was
20  correcting his own personal information.  My assumption
21  on the Beijing market, anything in the PPM related to
22  the Beijing market, he would have been involved in that.
23  But that's it.
24      Q.   You had never met Mr. Chan at the time of your
25  investment, correct?
26      A.   Correct.
27      Q.   You had never spoken with Mr. Chan at the time
28  of your investment, correct?
```

```
 1    A.    That's correct.

 2    Q.    So apart from the PPM, to the extent Mr. Chan

 3  may be responsible for any of its contents, there were

 4  no representations to you by Mr. Chan prior to your

 5  investment; is that correct?

 6    A.    That is correct.

 7    Q.    Do you have any other evidence that my client

 8  defrauded you or have we covered all of that?

 9    A.    Yes.

10    Q.    Other evidence or have we covered it?

11    A.    Have you covered it?  I'm not sure.

12    Q.    Have you covered all the evidence you have

13  against my client on the issue of fraud?

14    A.    I guess we did with my attorney, yes.

15    Q.    The subscription agreement contains several

16  additional warnings beyond the PPM's warnings; is that

17  correct?

18    A.    I'd have to look at that.  Do you have a page

19  number, sir?

20    Q.     It's attached to your complaint, what I refer

21  to as Exhibit A to the complaint.

22    A.    Okay.  And repeat the question again, please.

23    Q.    The subscription agreement contains several

24  additional warnings beyond the PPM's warnings, correct?

25    A.    Here we go.

26          Yes, there are several warnings, yes.

27    Q.    You read the subscription agreement before you

28  signed it, correct?
```

Case: 18-CA000    Doc#: 47-7    Filed: 02/04/19    Entered: 02/04/19 06:37:11    Page 3 of 5

1    A.   Yes, I did.

    2    Q.   You were provided the legal opinion on Chinese

    3 law dated March 20, 2006, right?

    4    A.   Sometime after March of 2006, yes.

    5    Q.   Did you read the legal opinion when it was

    6 provided to you?

    7    A.   Yes.

    8    Q.   Although the opinion was issued after your

    9 investment, you had an opportunity to at least raise

   10 objections to the management of the program, correct?

   11    A.   Can you be more specific?

   12         MR. WALSH:  Excuse me for a second.

   13         I'm going to object as vague and ambiguous and

   14 unintelligible.

   15         THE COURT:  Sustained.

   16 BY MR. WATTERS:

   17    Q.   Please turn to Exhibit 50, which is an email

   18 from -- strike that.

   19         51, which is the legal opinion letter,

   20 March 13, 2006.

   21    A.   Okay.

   22    Q.   You were saying in this action that Mr. Chan

   23 was a trustee to you.  Do you understand that?

   24    A.   Yes.

   25    Q.   Do you have any evidence that there was a

   26 signed trust agreement between you and Mr. Chan?

   27    A.   No, I do not have any trust agreement between

   28 Mr. Chan and myself.

1          Q.    Do you have any evidence there was ever a

2   signed trust agreement between Mr. Chan and either

3   entity in this case?

4          A.    No.

5          Q.    In any case, you -- strike that.

6                In any case, you were told that Chinese trust

7   law required the trustee to manage or dispose of trust

8   property in the trustee's own name, correct?

9          A.    I don't remember that, no.

10         Q.    Please turn to page 5 of the legal opinion,

11  section 2.6.  Do you see that, Mr. Frazer?

12         A.    I'm reading it right now, yes.

13               Okay.  I've read it.

14         Q.    Is it fair to say the opinion says that the

15  trustee must manage the property in the trustee's own

16  name?

17         A.    It does say that, yes.  However, I wasn't sure

18  that was a -- it was a trust that we had.  In other

19  words, there was such a thing as a foreign enterprise,

20  investment enterprise, FIE, and I was under the

21  impression that we qualified for that.

22         Q.    You were aware that -- strike that.

23               From the legal opinion, you were aware that a

24  surety bond was optional, right?

25         A.    I don't remember that per se.  If it's in

26  there, then okay.  I don't remember that part.

27         Q.    Please turn to page 6, section 2.9.  Would you

28  agree with me there is a lengthy section on surety