# Appendix E:  PLAT



Sections marked "A" through "H" are large villas on the golf course.

Case: 18-04060    Doc# 47-16    Filed: 02/04/19    Entered: 02/04/19 06:37:11    Page 1 of 28

## Appendix F:   MAP

Longxi, the location of Dragonwood, is located within the city limits of Beijing, and just 30 minutes south by freeway from the commerce section of Beijing.



Case: 18-04060    Doc# 47-16    Filed: 02/04/19    Entered: 02/04/19 06:37:11    Page 2 of 28

## Appendix G: Golf Course, Longxi Hotel and Spa facilities

Shown below are the Greg Norman World-Class 18-Hole golf course, the Longxi Hotel, business center and in-door natural hot springs and spa – all within walking distance to our Dragonwood condominiums.



Golf Course and high-rise condo view from Longxi Hotel and Spa. Driving range on right.



Entrance to the Long Xi Hotel Spa

PPM Appendix ABCDEFG 1A-3

Case: 18-04060    Doc# 47-16    Filed: 02/04/19    Entered: 02/04/19 06:37:11    Page 3 of 28



All weather indoor Spa Facility available to Dragonwood tenants



The world class 7200 yard Dragonwoods Golf Course designed by Greg Norman.

PPM Appendix ABCDEFG 1A-3

Case: 18-04060    Doc# 47-16    Filed: 02/04/19    Entered: 02/04/19 06:37:11    Page 4 of 28



Golf course is lighted for night play.



14.10.2005

Superbly maintained world class greens and fairways.  Hotel & Spa in background.

PPM  Appendix ABCDEFG 1A-3

Case: 18-04060    Doc# 47-16    Filed: 02/04/19    Entered: 02/04/19 06:37:11    Page 5 of 28

# APPENDIX H

Dragonwood 24 Condominium Rental, 36 Months

| | | | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 |
|---|---|---|---|---|---|---|---|---|
| **Proforma Property Operations** | | | | | | | | |
| Cash Raised | 5,022,000 | | | | | | | |
| Number of Condo Shells Purchased | 24 | | 0 | 0 | 1 | 4 | 8 | 12 |
| Rental Rate with 8.25% increase after 24 months | 2520 | 0.0825 | 2,520 | 2,520 | 2,520 | 2,520 | 2,520 | 2,520 |
| | | | | | | | | |
| Income | | | | | | | | |
| Gross Market Rent | | | 0 | 0 | 2,520 | 10,080 | 20,160 | 30,240 |
| Rent Concessions/Incentives | | | 0 | 0 | 0 | 0 | 0 | 0 |
| Gross Potential Rent | | | 0 | 0 | 2,520 | 10,080 | 20,160 | 30,240 |
| | | | | | | | | |
| Vacancy | 0.06 | | 0 | 0 | -151 | -605 | -1,210 | -1,814 |
| Credit Loss | 0.02 | | 0 | 0 | -50 | -202 | -403 | -605 |
| NET RENTAL INCOME | | | 0 | 0 | 2,318 | 9,274 | 18,547 | 27,821 |
| | | | | | | | | |
| Other Income | | | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS OPERATING INCOME | | | 0 | 0 | 2,318 | 9,274 | 18,547 | 27,821 |
| | | | | | | | | |
| Expenses | | | | | | | | |
| Property Taxes | 0.06 | of Basis | 0 | 0 | 0 | 0 | 0 | 0 |
| Rental Taxes | 0.05 | of gross rent | 0 | 0 | 0 | 0 | 0 | 0 |
| Property Insurance | 52 | per Condo/Month | 0 | 0 | 52 | 208 | 416 | 624 |
| Surety Bond | 0.005 | of Investment | 25,110 | 0 | 0 | 0 | 0 | 0 |
| Property Management Fee (10% of gross rent) | 0.10 | of Gross Rent | 0 | 0 | 232 | 927 | 1,855 | 2,782 |
| Utilities | 0 | Leasee pays | 0 | 0 | 0 | 0 | 0 | 0 |
| Repairs and Maintenance | 231 | per Condo/Month | 0 | 0 | 231 | 924 | 1,848 | 2,772 |
| Unit Turnover Expense | 2000 | per Condo/Month | 0 | 0 | 0 | 0 | 0 | 0 |
| General & Administrative | 18 | per Condo/Month | 0 | 0 | 18 | 72 | 144 | 216 |
| Investor Relations cost | 2500 | Per Month | 0 | 0 | 0 | 2,500 | 2,500 | 2,500 |
| Marketing | 250 | Per Month | 0 | 0 | 0 | 0 | 0 | 250 |
| Rent Commission (6% of one year's rent) | 0.06 | of 1-yr's Rent | 0 | 0 | 0 | 6,677 | 13,354 | 20,031 |
| TOTAL EXPENSES | | | 25,110 | 0 | 533 | 11,308 | 20,117 | 29,175 |
| | | | | | | | | |
| NET OPERATING INCOME | | | -25,110 | 0 | 1,786 | -2,035 | -1,570 | -1,354 |
| | | | | | | | | |
| Replacement Reserves | 75,000 | | 0 | 0 | 0 | 0 | 0 | 0 |
| NET CASH FLOW | | | -25,110 | 0 | 1,786 | -2,035 | -1,570 | -1,354 |
| | | | | | | | | |
| Debt Service (Int. only payments) | 0.06 | 1,382,544 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 |
| | | | | | | | | |
| Equity Return | | | | | | | | |
| Equity Yield | | | -0.64% | -0.14% | -0.10% | -0.18% | -0.17% | -0.16% |
| Equity Return | | | -32,023 | -6,913 | -5,127 | -8,947 | -8,482 | -8,267 |

Case: 18-04060    Doc# 47-16    Filed: 02/04/19    Entered: 02/04/19 06:37:11    Page 6

# APPENDIX H

Dragonwood 24 Condominium Rental, 36 Months

| Proforma Property Operations | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Year 1 | Month 13 | Month 14 |
|---|---|---|---|---|---|---|---|---|---|
| Cash Raised | | | | | | | | | |
| Number of Condo Shells Purchased | 16 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 |
| Rental Rate with 8.25% increase after 24 months | 2,520 | 2,520 | 2,520 | 2,520 | 2,520 | 2,520 | 2,520 | 2,520 | 2,520 |
| **Income** | | | | | | | | | |
| Gross Market Rent | 40,320 | 60,480 | 60,480 | 60,480 | 60,480 | 60,480 | 405,720 | 60,480 | 60,480 |
| Rent Concessions/Incentives | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Gross Potential Rent | 40,320 | 60,480 | 60,480 | 60,480 | 60,480 | 60,480 | 405,720 | 60,480 | 60,480 |
| Vacancy | -2,419 | -3,629 | -3,629 | -3,629 | -3,629 | -3,629 | -24,343 | -3,629 | -3,629 |
| Credit Loss | -806 | -1,210 | -1,210 | -1,210 | -1,210 | -1,210 | -8,114 | -1,210 | -1,210 |
| NET RENTAL INCOME | 37,094 | 55,642 | 55,642 | 55,642 | 55,642 | 55,642 | 373,262 | 55,642 | 55,642 |
| Other Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS OPERATING INCOME | 37,094 | 55,642 | 55,642 | 55,642 | 55,642 | 55,642 | 373,262 | 55,642 | 55,642 |
| **Expenses** | | | | | | | | | |
| Property Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 349,296 | 0 | 0 |
| Rental Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 18,663 | 0 | 0 |
| Property Insurance | 832 | 1,248 | 1,248 | 1,248 | 1,248 | 1,248 | 8,372 | 1,248 | 1,248 |
| Surety Bond | 0 | 0 | 0 | 0 | 0 | 0 | 25,110 | 0 | 0 |
| Property Management Fee (10% of gross rent) | 3,709 | 5,564 | 5,564 | 5,564 | 5,564 | 5,564 | 37,326 | 5,564 | 5,564 |
| Utilities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Repairs and Mantenance | 3,696 | 5,544 | 5,544 | 5,544 | 5,544 | 5,544 | 37,191 | 5,544 | 5,544 |
| Unit Turnover Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| General & Administrative | 288 | 432 | 432 | 432 | 432 | 432 | 2,898 | 432 | 432 |
| Investor Relations cost | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 22,500 | 2,500 | 2,500 |
| Marketing | 250 | 250 | 250 | 250 | 250 | 0 | 1,500 | 0 | 0 |
| Rent Commission (6% of one year's rent) | 0 | 0 | 0 | 0 | 0 | 0 | 40,062 | 0 | 0 |
| TOTAL EXPENSES | 11,275 | 15,538 | 15,538 | 15,538 | 15,538 | 15,288 | 193,622 | 15,288 | 15,288 |
| NET OPERATING INCOME | 25,819 | 40,103 | 40,103 | 40,103 | 40,103 | 40,353 | 179,640 | 40,353 | 40,353 |
| Replacement Reserves | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 | 5,000 | 5,000 |
| NET CASH FLOW | 20,819 | 35,103 | 35,103 | 35,103 | 35,103 | 35,353 | 149,640 | 35,353 | 35,353 |
| Debt Service (Int. only payments) | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 82,953 | 6,913 | 6,913 |
| **Equity Return** | | | | | | | | | |
| Equity Yield | 0.38% | 0.66% | 0.66% | 0.66% | 0.66% | 0.67% | 1.93% | 0.67% | 0.67% |
| Equity Return | 18,906 | 33,191 | 33,191 | 33,191 | 33,191 | 33,441 | 96,687 | 33,441 | 33,441 |

Case: 18-04060    Doc# 47-16    Filed: 02/04/19    Entered: 02/04/19 06:37:11    Page 7

# APPENDIX H

Dragonwood 24 Condominium Rental, 36 Months

| | Month 15 | Month 16 | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 | Month 23 |
|---|---|---|---|---|---|---|---|---|---|
| **Proforma Property Operations** | | | | | | | | | |
| Cash Raised | | | | | | | | | |
| Number of Condo Shells Purchased | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 |
| Rental Rate with 8.25% increase after 24 months | 2,520 | 2,520 | 2,520 | 2,520 | 2,520 | 2,520 | 2,520 | 2,520 | 2,520 |
| **Income** | | | | | | | | | |
| Gross Market Rent | 60,480 | 60,480 | 60,480 | 60,480 | 60,480 | 60,480 | 60,480 | 60,480 | 60,480 |
| Rent Concessions/Incentives | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Gross Potential Rent | 60,480 | 60,480 | 60,480 | 60,480 | 60,480 | 60,480 | 60,480 | 60,480 | 60,480 |
| Vacancy | -3,629 | -3,629 | -3,629 | -3,629 | -3,629 | -3,629 | -3,629 | -3,629 | -3,629 |
| Credit Loss | -1,210 | -1,210 | -1,210 | -1,210 | -1,210 | -1,210 | -1,210 | -1,210 | -1,210 |
| NET RENTAL INCOME | 55,642 | 55,642 | 55,642 | 55,642 | 55,642 | 55,642 | 55,642 | 55,642 | 55,642 |
| Other Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS OPERATING INCOME | 55,642 | 55,642 | 55,642 | 55,642 | 55,642 | 55,642 | 55,642 | 55,642 | 55,642 |
| **Expenses** | | | | | | | | | |
| Property Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rental Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Property Insurance | 1,248 | 1,248 | 1,248 | 1,248 | 1,248 | 1,248 | 1,248 | 1,248 | 1,248 |
| Surety Bond | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Property Management Fee (10% of gross rent) | 5,564 | 5,564 | 5,564 | 5,564 | 5,564 | 5,564 | 5,564 | 5,564 | 5,564 |
| Utilities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Repairs and Mantenance | 5,544 | 5,544 | 5,544 | 5,544 | 5,544 | 5,544 | 5,544 | 5,544 | 5,544 |
| Unit Turnover Expense | 0 | 2,000 | 2,000 | 2,000 | 0 | 0 | 2,000 | 2,000 | 0 |
| General & Administrative | 432 | 432 | 432 | 432 | 432 | 432 | 432 | 432 | 432 |
| Investor Relations cost | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Marketing | 0 | 250 | 250 | 250 | 0 | 0 | 250 | 250 | 0 |
| Rent Commission (6% of one year's rent) | 0 | 3,338 | 3,338 | 3,338 | 0 | 0 | 3,338 | 3,338 | 0 |
| TOTAL EXPENSES | 15,288 | 20,877 | 20,877 | 20,877 | 15,288 | 15,288 | 20,877 | 20,877 | 15,288 |
| NET OPERATING INCOME | 40,353 | 34,765 | 34,765 | 34,765 | 40,353 | 40,353 | 34,765 | 34,765 | 40,353 |
| Replacement Reserves | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| NET CASH FLOW | 35,353 | 29,765 | 29,765 | 29,765 | 35,353 | 35,353 | 29,765 | 29,765 | 35,353 |
| Debt Service (Int. only payments) | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 |
| **Equity Return** | | | | | | | | | |
| Equity Yield | 0.67% | 0.55% | 0.55% | 0.55% | 0.67% | 0.67% | 0.55% | 0.55% | 0.67% |
| Equity Return | 33,441 | 27,852 | 27,852 | 27,852 | 33,441 | 33,441 | 27,852 | 27,852 | 33,441 |

Case: 18-04060   Doc# 47-16   Filed: 02/04/19   Entered: 02/04/19 06:37:11   Page 8

# APPENDIX H

Dragonwood 24 Condominium Rental, 36 Months

| | Month 24 | Year 2 | Month 25 | Month 26 | Month 27 | Month 28 | Month 29 | Month 30 | Month 31 |
|---|---|---|---|---|---|---|---|---|---|
| **Proforma Property Operations** | | | | | | | | | |
| Cash Raised | | | | | | | | | |
| Number of Condo Shells Purchased | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 |
| Rental Rate with 8.25% increase after 24 months | 2,728 | 2,728 | 2,728 | 2,728 | 2,728 | 2,728 | 2,728 | 2,728 | 2,728 |
| **Income** | | | | | | | | | |
| Gross Market Rent | 60,480 | 725,760 | 60,688 | 60,688 | 60,688 | 60,688 | 60,688 | 60,688 | 60,688 |
| Rent Concessions/Incentives | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Gross Potential Rent | 60,480 | 725,760 | 60,688 | 60,688 | 60,688 | 60,688 | 60,688 | 60,688 | 60,688 |
| Vacancy | -3,629 | -43,546 | -3,641 | -3,641 | -3,641 | -3,641 | -3,641 | -3,641 | -3,641 |
| Credit Loss | -1,210 | -14,515 | -1,214 | -1,214 | -1,214 | -1,214 | -1,214 | -1,214 | -1,214 |
| NET RENTAL INCOME | 55,642 | 667,699 | 55,833 | 55,833 | 55,833 | 55,833 | 55,833 | 55,833 | 55,833 |
| Other Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS OPERATING INCOME | 55,642 | 667,699 | 55,833 | 55,833 | 55,833 | 55,833 | 55,833 | 55,833 | 55,833 |
| **Expenses** | | | | | | | | | |
| Property Taxes | 0 | 349,296 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rental Taxes | 0 | 33,385 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Property Insurance | 1,248 | 14,976 | 1,248 | 1,248 | 1,248 | 1,248 | 1,248 | 1,248 | 1,248 |
| Surety Bond | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Property Management Fee (10% of gross rent) | 5,564 | 66,770 | 5,583 | 5,583 | 5,583 | 5,583 | 5,583 | 5,583 | 5,583 |
| Utilities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Repairs and Mantenance | 5,544 | 66,528 | 5,544 | 5,544 | 5,544 | 5,544 | 5,544 | 5,544 | 5,544 |
| Unit Turnover Expense | 0 | 10,000 | 0 | 0 | 2,000 | 4,000 | 8,000 | 24,000 | 0 |
| General & Administrative | 432 | 5,184 | 432 | 432 | 432 | 432 | 432 | 432 | 432 |
| Investor Relations cost | 2,500 | 30,000 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Marketing | 0 | 1,250 | 0 | 0 | 250 | 250 | 250 | 250 | 0 |
| Rent Commission (6% of one year's rent) | 0 | 16,692 | 0 | 0 | 3,350 | 6,700 | 13,400 | 36,850 | 0 |
| TOTAL EXPENSES | 15,288 | 244,785 | 15,307 | 15,307 | 20,907 | 26,257 | 36,957 | 76,407 | 15,307 |
| NET OPERATING INCOME | 40,353 | 422,914 | 40,526 | 40,526 | 34,926 | 29,576 | 18,876 | -20,574 | 40,526 |
| Replacement Reserves | 5,000 | 60,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| NET CASH FLOW | 35,353 | 362,914 | 35,526 | 35,526 | 29,926 | 24,576 | 13,876 | -25,574 | 35,526 |
| Debt Service (Int. only payments) | 6,913 | 82,953 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 |
| **Equity Return** | | | | | | | | | |
| Equity Yield | 0.67% | 6.77% | 0.67% | 0.67% | 0.56% | 0.45% | 0.24% | -0.55% | 0.67% |
| Equity Return | 33,441 | 339,961 | 33,613 | 33,613 | 28,013 | 22,663 | 11,963 | -27,487 | 33,613 |

# APPENDIX H

Dragonwood 24 Condominium Rental, 36 Months

| | Month 32 | Month 33 | Month 34 | Month 35 | Month 36 | Year 3 | 3-year TTL |
|---|---|---|---|---|---|---|---|
| **Proforma Property Operations** | | | | | | | |
| Cash Raised | | | | | | | |
| Number of Condo Shells Purchased | 24 | 24 | 24 | 24 | 24 | 24 | |
| Rental Rate with 8.25% increase after 24 months | 2,728 | 2,728 | 2,728 | 2,728 | 2,728 | 2,728 | |
| | | | | | | | |
| Income | | | | | | | |
| Gross Market Rent | 60,688 | 60,688 | 60,688 | 60,688 | 60,688 | 728,255 | 1,859,735 |
| Rent Concessions/Incentives | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Gross Potential Rent | 60,688 | 60,688 | 60,688 | 60,688 | 60,688 | 728,255 | 1,859,735 |
| | | | | | | | 0 |
| Vacancy | -3,641 | -3,641 | -3,641 | -3,641 | -3,641 | -43,695 | -111,584 |
| Credit Loss | -1,214 | -1,214 | -1,214 | -1,214 | -1,214 | -14,565 | -37,195 |
| NET RENTAL INCOME | 55,833 | 55,833 | 55,833 | 55,833 | 55,833 | 669,994 | 1,710,956 |
| | | | | | | | |
| Other Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS OPERATING INCOME | 55,833 | 55,833 | 55,833 | 55,833 | 55,833 | 669,994 | 1,710,956 |
| | | | | | | | |
| Expenses | | | | | | | |
| Property Taxes | 0 | 0 | 0 | 0 | 0 | 349,296 | 1,047,887 |
| Rental Taxes | 0 | 0 | 0 | 0 | 0 | 33,500 | 85,548 |
| Property Insurance | 1,248 | 1,248 | 1,248 | 1,248 | 1,248 | 14,976 | 38,324 |
| Surety Bond | 0 | 0 | 0 | 0 | 0 | 0 | 25,110 |
| Property Management Fee (10% of gross rent) | 5,583 | 5,583 | 5,583 | 5,583 | 5,583 | 66,999 | 171,096 |
| Utilities | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Repairs and Mantenance | 5,544 | 5,544 | 5,544 | 5,544 | 5,544 | 66,528 | 170,247 |
| Unit Turnover Expense | 0 | 0 | 0 | 0 | 0 | 38,000 | 48,000 |
| General & Administrative | 432 | 432 | 432 | 432 | 432 | 5,184 | 13,266 |
| Investor Relations cost | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 | 82,500 |
| Marketing | 0 | 0 | 0 | 0 | 0 | 1,000 | 3,750 |
| Rent Commission (6% of one year's rent) | 0 | 0 | 0 | 0 | 0 | 60,299 | 117,054 |
| TOTAL EXPENSES | 15,307 | 15,307 | 15,307 | 15,307 | 15,307 | 316,487 | 754,894 |
| | | | | | | | |
| NET OPERATING INCOME | 40,526 | 40,526 | 40,526 | 40,526 | 40,526 | 353,508 | 956,062 |
| | | | | | | | |
| Replacement Reserves | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 | 150,000 |
| NET CASH FLOW | 35,526 | 35,526 | 35,526 | 35,526 | 35,526 | 293,508 | 806,062 |
| | | | | | | | |
| Debt Service (Int. only payments) | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 82,953 | 248,858 |
| | | | | | | | |
| Equity Return | | | | | | | |
| Equity Yield | 0.67% | 0.67% | 0.67% | 0.67% | 0.67% | 5.39% | 14.08% |
| Equity Return | 33,613 | 33,613 | 33,613 | 33,613 | 33,613 | 270,555 | 707,204 |



## ADDENDUM J
**Repatriation of Profits and Beijing Taxes**

**If needed, a standby letter of credit can be used as a backup plan, a tried-and-true method of repatriating funds in the event that easier methods are not available.**

Most commercial banks with foreign operations offer a standby letter of credit. The standby Letter of Credit is an instrument whereby a bank customer deposits funds in a US bank. Those funds may be in the form of long or short term interest bearing deposits. The bank places a lien on those funds and then drafts a standby letter of credit to a foreign correspondent bank in the foreign country, whereby the US bank guarantees the repayment of a loan of a similar amount in the foreign country to the depositor's overseas affiliate. Then, when the overseas affiliate pays off the loan, the domestic bank releases the lien and the depositor can return the investment to its original investors. Since the funds never left the country, there is no issue with repatriating the original investment.

**Dragonwood property may be sold to persons or entities outside of China, which would make repatriation a moot point since payment funds would transfer from a US source to the LLC.**

Since contracts among foreign enterprises are recognized in China, and since there are no longer restrictions on foreign enterprises owning property in China, foreign enterprises can enter into agreements outside of China to buy and sell properties in China. By conducting the sale outside of China, the issue of repatriating the profits on the venture are likewise avoided.

**Surety Bond for Simon Chan in Beijing in favor of the LLC. This is mainly for procuring the property, improving it and placing it on the rental market.**

Surety bonds are offered by companies such as Traveler's Insurance for such risks as employee dishonesty such as conversion of funds or conversion of property. The bond acts as insurance to the employer and covers all employees named in the policy wherever the employee works in the world. Generally, there is a deductible, such as $5,000.00. By this means the Insurance Company avoids companies submitting claims for petty theft.

**Taxes in China**

Tax law in the People's Republic of China is changing as rapidly as the country is developing. More important to property owners than the tax laws and executive directives are the various levels of implementation and enforcement. Real estate in different parts of Beijing may be taxed differently and at different times the taxes may vary. The highest tax rates occur at the time a property is sold, with other taxes, such as rental income taxes being much lower. The following discussion summarizes all the applicable taxes on real estate at their maximum rate for the purposes of calculating the highest possible impact on real estate return on investment.

**Purchase of land use rights and purchase of improvements (transfer taxes)**
The buyer will pay about 5.5 percent at the time of purchase of the property plus some fee (about 0.2 to 0.5 percent). Without the receipt of this tax, the recording department will refuse to process the title registration.

**New improvements taxes (reassessment)**
This tax applies to developers only during their first time of developing land improvements. It does not apply to property owner regarding built-out improvements. Unlike in the States, there is no reassessment of property tax to the property owners for 3 years. After that, the property owner may be subject to 1.2 percent property tax. At present, there is no implementation of property tax collection scheme in the system.

**Rental and lease income taxes**
This tax is composed of two parts. One is called the official receipt of the rental income. This is 5 percent the face value of the lease. The tenants will need the official receipt to get tax deduction for their respective employers in China. The second part is income tax due by the landlord. This amounts to 20 percent to individual owners and 33% by corporation. 4. Sale of property tax Up to 20 percent of the property gain is taxable.

**Stamp tax**
Stamp tax is minimal, varying from .05 percent to 0.1 percent.

The following is a link to the current Beijing tax system for a more detailed description:
http://english.tax861.gov.cn/zgszky/zgszky.htm

March 13, 2006

Dragonwood, LLC
225 Bush Street, 16th Floor
San Francisco, CA 94104

RE:   **EQUITY FINANCING WITH REGARD TO DRAGONWOOD, LLC, SERIES A OFFERING FOR PROPERTY IN BEIJING, CHINA**

Ladies and Gentlemen:

You, Dragonwood, LLC (the "**LLC**" or the "**Client**"), have requested our opinion (the "**Opinion**") in connection with the above-referenced project ("**Project**").

We provide our Opinion to you pursuant to the Series A Subscription Agreement and Dragonwood, LLC Operating Agreement.

## I.    BACKGROUND

1.1   <u>Documents Reviewed</u>.  In giving this Opinion, we have reviewed the following:

(a)   Dragonwood LLC Confidential Private Placement Memorandum dated January 10th, 2006 made by the Client;

(b)   Series A Subscription Agreement dated as of January 9, 2006, between the Client and certain individual investors with respect to certain property including real property located at 8 Shunjinglu Panggezhuang, Daxing District (the "**Property**");

(c)   Amended LLC Operating Agreement dated as of January 9, 2006, executed by the Client;

(d)   Articles of Organization of the LLC issued by the State of Delaware; and

(e)   One Form D filed with the Department of Corporations of the State of California.

1.2     Capitalized Terms and Glossary.  Except as otherwise indicated herein, capitalized terms used in the Opinion are defined as set forth in this Opinion or the Glossary attached to this Opinion.

1.3     Opining Jurisdiction.  The law covered by the opinions expressed in this Opinion letter is limited to the law of the State of California, the General Corporation Law of the State of Delaware, and the law of the People's Republic of China.  We express no opinion concerning the laws of any other jurisdiction, the other laws of Delaware, or the effect thereof.

1.4     Scope of Review.  In connection with the opinions hereinafter set forth, we have limited the scope of our review of the documents related to the Project.  We have reviewed only the documents listed in Section 1.1 and made no other investigation or factual inquiry beyond these documents.

1.5     Reliance without Investigation.  We have relied, without investigation or analysis, upon information in **Public Authority Documents** (as defined in the attached Glossary).  Except to the extent the information constitutes a statement, directly or in practical effect, of any legal conclusion at issue, we have relied, without investigation or analysis, upon the information contained in representations made by the Client and on information provided by officials of the Client, which we reasonably believe, in each case, to be an appropriate source for the information.

## II. OPINIONS

Based upon and subject to the foregoing and to the qualifications set forth below, we are of the opinion that:

2.1     Legal Recognitions of Private Property Ownership by Chinese Laws.

    (a)     Constitutional Law.  The 10th National People's Congress adopted Amendments to the Constitution of the People's Republic of China (the "**Amended Constitution**").  Under the Amended Constitution, citizens' lawful private property is inviolable.[1]  According to the Amended Constitution, the State, in accordance with law, protects the rights of citizens to private property and to its inheritance.  The State may, in the public interest and in accordance with law, expropriate or requisition private property for its use and shall make compensation for the private property expropriated or requisitioned.[2]

    (b)     Property Rights Law.  Currently, rules governing real property are spread over numerous areas of laws and administrative regulations.  In July 2005, the National People's Congress of the People's Republic of China issued a draft Property Rights Law (the "**Draft Property Law**").  The Draft Property Law, currently circulated among legal experts, once

---

[1] Article 13 of the Amended Constitution.
[2] Article 13 of the Amended Constitution.

2

promulgated, will become the first comprehensive legal authority governing real property rights in China.

According to the Land Management Law of the People's Republic of China (the "**Land Law**"),[3] China employs "socialism public ownership" system over all its land. All land belongs to "whole people" and the "working mass collectively." It is illegal for any entity or individual to possess, purchase, sell, or transfer land. However, "land use rights" are permitted to be transferred in accordance with the law.[4]

The Draft Property Law does not alter the fundamental principles governing real property ownership in China, but it does provide guidance on several important theoretical and practical questions. Individuals or legal entities can obtain granted land use rights of varying duration depending on the ultimate use of the land. Residential land use rights are typically valid for 70 years.[5]

Under the Draft Property Law, property can be owned either by the State, collective entities or private persons.[6] Private persons are defined to include citizens, sole proprietors, foreigners, persons without nationality, enterprises owned by a single person, and foreign-invested enterprises.[7]

    2.2   <u>Registration Requirements</u>. Under the Draft Property Law, rights to real property do not become effective until they have been registered. Article 9 of the law provides that "any establishment, amendment, transfer or termination of real property rights must be registered with relevant registration authorities, unless otherwise specified by applicable law."

However, Article 15 of the Draft Property Law states that "unless otherwise specified by law or agreed upon in the contracts, parties may enter into contracts with regard to the establishment, amendment, transfer and termination of real property rights, and such contract become effective upon formation. The validity of the contracts will not be affected even though the property rights are not registered."

Both articles are in conflict with each other. We recommend that when entering into any contract that involves the "establishment, amendment, transfer and termination of real property rights," the Client should specify in the contract that "THE ESTABLISHMENT, AMENDMENT, TRANSFER AND TERMINATION OF THE REAL PROPERTY RIGHTS" SHALL NOT TAKE INTO EFFECT UNLESS SUCH "ESTABLISHMENT, AMENDMENT, TRANSFER AND TERMINATION OF THE REAL PROPERTY RIGHTS" ARE REGISTERED WITH THE COMPETENT AUTHORITY OR AUTHORITIES.

---

[3] Originally published in 1986, and amended in 1998, and again in 2004.
[4] Article 2 of the Land Law.
[5] Article 12 of the *Interim Regulations of the People's Republic of China on Assignment and Transfer of the Rights to Use State-Owned Land in Urban Areas*.
[6] Articles 51 to 68 of the Draft Property Law.
[7] Article (1) of the Supplements of the Draft Property Law.

3

2.3     Protections under the Draft Property Law. The Draft Property Law provides that infringement of ownership rights is subject to civil, administrative, or criminal liabilities.[8] One's right to request elimination of interference or elimination of danger is not subject to any statute of limitation.[9]

2.4     Legal Entities Holding Properties. Under the Draft Property Law, enterprise legal persons have the right to "possess, utilize, benefit from, or dispose of properties that they own in accordance with laws and regulations."[10] The law also provides that "the Chinese Company Law shall govern enterprises in 'company format' in handling their real properties owned by them."[11] "Properties owned by legal persons other than enterprise legal persons are governed by other applicable laws and regulations."[12]

The Draft Property Law does not prohibit a foreign company to own property in China. However, the law failed to provide any implementation details to sponsor such ownership.

2.5     Tax Law Implications. Under Chinese law, corporations and individuals are subject to different taxes over real properties that they own. Furthermore, China is gradually eliminating the differentiated tax treatments between Chinese and foreign companies to comply with its WTO commitment. Still, foreign companies are currently taxed differently depending on whether such companies have legal "presence" in China.

(a)     Taxes for Foreign Invested Enterprises. In China, foreign companies' subsidiaries are commonly known as Foreign Invested Enterprises ("FIEs"). FIEs are considered Chinese legal persons and are taxed as such. Generally, a Chinese enterprise is subject to State and local taxes, such as business operation tax, income tax, and stamp tax (when applicable). An FIE, as a Chinese legal person, is generally subject to all applicable corporate taxes. Details of the taxes are specified by Foreign Invested Enterprise and Foreign Enterprise Income Tax Law and other relevant regulation.

We are giving no opinion with regard to the details of corporate taxes but merely acknowledge the fact that FIEs are generally subject to Chinese corporate taxes.

To set up a Chinese subsidiary, a foreign company must pay a minimum registered capital at the time of registration or within a timeframe required by law. An FIE's minimum capital requirement is mostly decided by the nature of business of the company. Details of minimum registered capital requirements are specified in Chinese Company Law and other relevant laws. In addition, an FIE's approval is subject to the evaluations under the

---

[8]  Article 43 of the Draft Property Law.
[9]  Article 44 of the Draft Property Law.
[10]  Article 70 of the Draft Property Law.
[11]  Article 70 of the Draft Property Law.
[12]  Article 70 of the Draft Property Law.

4

country's industrial policy, and the Foreign Enterprise Investment Guide Category published by the State periodically.

We give no opinion on the details of these requirements and merely acknowledge the fact that there are minimum registered capital required and other legal and administrative examinations involved in an FIE's establishment process.

(b)   <u>Taxes on Rental Income of Foreign Enterprises</u>.  According to the Notice of Handling Tax Issues with regard to Foreign Enterprises' Leasing and Collecting Rental Income from Houses and Buildings within Chinese Territory (the "**Notice**"), issued by the State General Tax Bureau, foreign enterprises' rental income is subject to business operation tax and corporate income tax.

The Notice also specifies that for foreign enterprises that "do not have presence" in China, but "manage their properties through their representatives in China, or through local Chinese entities or individuals," their rental income is taxed as same as the one of enterprises "with legal presence" in China.  In other words, if the foreign company manages its Chinese real property through a company or an individual in China, it will be taxed as an FIE.

(c)   <u>Taxes on Rental Income of Individuals</u>.  Individuals are not subject to corporate taxes, but their rental income is still taxable.  According to the Notice of Handling Tax Issues with regard to Individuals' Leasing and Collecting Rental Incomes from Houses within Chinese Territory, issued by the State General Tax Bureau, rental income of individuals, regardless whether these individuals are residing in China, is subject to individual income taxes (after deductions allowed by law).  Details of taxes imposed on individuals' rental income are specified in Individual Income Tax Law and other relevant laws and regulations.

We give no opinion as to details of these taxes or their implementations but merely acknowledge the fact that under the current tax laws, individuals' rental income is subject to individuals' income tax law.

2.6   <u>Trust Law</u>.  The Chinese Trust Law provides that a trust is "an act whereby a settlor, based on his trust in a trustee, entrusts the property rights in his property to the trustee who shall, in return, manage or dispose of the trust property *in the trustee's own name*, in accordance with the wishes of the settlor, and for the benefit of a designated beneficiary or for a special purpose."  Under Chinese Trust Law, both the settlor and the trustee could be either a natural person, or a legal person.  Similar to its California counterpart, the Chinese Trust Law maintains that under a trust, property rights are "entrusted" rather than "transferred" to a trustee.  However, unlike under California law, a trustee in China is to manage the trust "in his or her own name."

Case: 18-04060   Doc# 47-16   Filed: 02/04/19   Entered: 02/04/19 06:37:11   Page 17 of 28

However, it is not clear whether a property managed by a trust in the trustee's personal name would be taxed as a business entity, or an individual. In our opinion, it seems to be the legislation's intent that a property owned by a legal entity but managed by a trust be treated as the corporate property, and not the property of the individual trustee. Therefore, the LLC's Property entrusted with Simon Chan is most likely to be subject to tax as a corporate property under Chinese law.

2.7    Contracts Law. Valid contracts are generally enforceable in China. Under Chinese Contracts Law (the "**Contracts La**w"), contracts entered in accordance with the law become valid upon formation. Contracts that are required by law or administrative regulations to be approved or registered become effective upon such approval or registration.[13]

Parties to a contract may agree to subject the contract to other conditions. A contract entered as such will become not binding unless all conditions are satisfied.[14] For example, in a contract, parties may decide that the contract must be notarized before it becomes effective. Under this condition, the contract will not become valid until and unless the contract is notarized by the competent notarization authority.

Furthermore, contracts may be entered into in more than one language. In the contract, parties may agree that all languages shall have the same validity. In case where languages used in different versions are inconsistent, the court will interpret the terms according to "goal of the contract."[15]

2.8    Effect of Notarized Contracts. Only lawful contracts can be notarized. Under the Chinese Notarization Law (the "**Notarization Law**"), "notarized civil legal activities" and "legally meaningful facts and documents" should be the evidence in the discovery process in legal procedures.[16] However, each party may still submit evidence proving the contrary. In the context of a debt contract, if the debtor party promised to be bound to accept legal enforcement in the contract, the creditor may request the debtor's performance by submitting the notarized contract to the court.[17]

2.9    Surety and Bond Insurance. In any investment endeavor, investors may face certain risks during his or her investment activity. Especially, people investing in an overseas market, such as investors in the current Project, may be exposed to even greater risks (further analyses of risks are discussed below in Section 2.11.) Surety and bond, commonly used in connection with traditional construction projects, provide valuable protections to project owners and other parties.

Although whether sureties or bond insurances suitable for the investment activities in our Project ("**Suitable Bond**") are available is unknown to us, we are of the opinion that the Suitable Bond, if available, should provide valuable protections to investors. The following is an analogy

---

[13]  Article 44 of the Contracts Law.
[14]  Article 44 of the Contracts Law.
[15]  Article 125 of the Contracts Law.
[16]  Article 36 of the Notarization Law.
[17]  Article 37 of the Notarization Law.

6

of bonds in traditional construction projects.  We provide such an analogy to illustrate how Suitable Bond would help in the Project in general.  For details on how Suitable Bond may help at different stages of the Project, Client and its investors should conduct due diligence to further determine the availability and details of any Suitable Bond coverage.

Surety and bond insurance provide protections to owners in a traditional construction project in the following ways:

(a)  Risk Transfer.  Although requiring the contractor to furnish a performance bond will not guarantee a trouble-free project, surety bonds do transfer a certain amount of risk from the owner to the surety.  The performance bond provides some measure of security to the owner that if the contractor does default, the owner will be able to look to the surety, who is financially obligated, up to the penal sum of the bond, to (a) reimburse the owner for the cost the owner incurs in completing or repairing the work; or (b) take over the contractor's work and see that it is completed or repaired.

Opinion: like any other insurance, Suitable Bond would transfer risks – either foreseeable or non-foreseeable – but associated with non-performance of the LLC, its agent(s) or other parties bonded, from investors to the bond carrier(s).  Client and its investors should determine and negotiate with bond provider(s) details of the coverage at different stages of the Project, policy length, and other important factors.

(b)  Non-Default Protection.  The benefit to the owner or obligee is not limited to situations involving an actual default by the contractor.  The mere existence of the bond gives the owner some measure of leverage over the principal in the event a dispute arises that falls short of an actual declaration of default by the owner.

Opinion: in our Project, when the Project is bonded, the investor may have leverage over the Client without actually having to declare the Client (or its agents) in default.

(c)  Expediting Solving the Problem.  Once the surety is put on notice of the dispute between the contractor and the owner (or obligee), the contractor usually faces some pressure from its surety to resolve the dispute before the surety is required to launch a formal investigation and possibly take some action that will result in the surety looking to the contractor for reimbursement.  More than one dispute has been solved in favor of an owner by a contractor who would concede an issue to the owner rather than run the risk of its surety coming in and incurring a loss on its behalf.

Opinion: when bonded, the LLC (and/or its agent(s)), might voluntarily look to solve any dispute with its investors before turning the matter to the insurance, thus helps to solve the problem on an expedited basis.

7

(d)    <u>Underwriting</u>.  The owner also benefits from the surety's underwriting of the principal.  Sureties' are in business of evaluating contractors and making decisions whether to guarantee their performance.  By requiring the contractor to furnish a performance bond, the owner has usually caused the contractor to undergo some measure of underwriting by a surety who has conducted an investigation into the contractor's financial condition and ability to perform the work, and who has determined that the contractor does not pose an undue risk of default or loss to the surety.

Opinion: risks particularly associated with investing in an overseas market are often beyond one's ability to predict.  A professional insurance company's evaluation of a particular principal and its project is an indicator as to how much risk is involved.  However, one must bear in mind that the current Project involves properties located in China, with which fewer domestic insurance companies have experience.  Therefore, their decision whether to underwrite may not be as clear an indicator of the risks involved.

(e)    <u>Development of Surety Bond in China</u>.  In China, bonds are mandatory in public construction projects.  Docket No. 137 requires the adoption of surety bonds in all real estate development projects with construction costs over RMB 10 Million (approximately US$1,250,000).  Other recent steps, which appear to indicate acceleration in the use of surety bonds, include the issue by the Chinese Ministry of Commerce of a full set of model surety bond contracts, and six more cities being instructed to introduce surety bonds in construction projects on a trial basis.  The draft Construction Law for Soliciting Opinion issued in August 2004 also mandates the use of surety bonds in construction projects, which use funds invested or financed by the State.

Opinion: internationally, project owners and contractors are facing significantly increasing risks associated with construction projects.  Although bonds are not required by law in private construction projects in China, purchasing bond insurance is not an uncommon practice among prudent parties in China.  One or more surety bonds are frequently used to cover non-performance, project not properly done or contractors' becoming insolvent during the course of project.

2.11   <u>Risk Evaluation</u>.  The following is evaluations of the risks associated with the Project.  The list is not exclusive and does not exhaust all the risks an investor may be exposed to.

(a)    <u>Eminent Domain</u>.  Under the Draft Project Law, private property can be expropriated by the government in the public interest, provided that

8

owners of such property must be compensated according to the relevant provisions set forth by the government or for a reasonable amount.[18]

The Draft Property Law does not define the "public interest" for which the property may be expropriated by the government, and neither does it require the government to pay fair market value when it does expropriate property, as is the practice in most countries.

(b) <u>Operation</u>. During the course of operation, investors face the possibility of changes in law and policies that govern private property ownership, land title issues, taxation, condo conversion, rental and lease, etc. Such changes may render the operation of the Project illegal or impractical.

(c) <u>Resale</u>

    i.    <u>Sales Restriction</u>. Reportedly, Chinese government agencies at various levels have adopted new tax measures to encourage residential purchases and curb real estate speculation. For example, the Shanghai Local Tax Bureau announced that, beginning March 7, 2005, individuals (including foreigners) who sell residential property within one year after its purchase will be subject to a business tax at 5% based on the gains and the relevant surtaxes. Sales made after the one-year holding period will be exempted from business tax and the relevant surtaxes.[19]

          Some other regions have also adopted some similar policies. Measures vary from city to city and capital gains tax is imposed depending upon the length of a buyer's holding period.

    ii.   <u>Underdeveloped Public Market</u>. China is gradually developing a public house trading system. Although there are government agencies and local private companies that provide house trading information and services, there is not a multiple listing system in place. Due to factors such as unfamiliar with local environment, language barrier, investors may have limited access to the local public markets.

(d) <u>Scrutiny Over Repatriating Rental Income</u>. China's rapid economic development and urbanizing population makes property an attractive industry for foreign investors. However, foreign investors face broad challenges in real estate investment. For example, scrutiny over repatriating rental income and other funds for distribution, is one of those challenges.

---

[18] Article 49 of the Draft Project Law.
[19] *Shanghai Adjusts Financial and Tax Policies for Real Estate Market* issued by Shanghai Financial Bureau, Shanghai Local Tax Bureau.

9

Under the Provisional Measures of Foreign Investment Enterprises Foreign Exchange Management issued by the Beijing Municipal Government, all foreign investment enterprises must deposit all their foreign currency income into Chinese domestic bank accounts. Any and all expenditures of foreign currency accounts shall be supervised by the Chinese banks.[20] Under these restrictions, investors may also have difficulties receiving the profits from their investment in time when they elect to exit the market.

(e)     Risks Associated with Chinese Laws, Regulations and Policies. Investing in China, investors are facing the country's rapidly changing laws and policies. For example, on January 10, 2004, the State Council issued a notice that put a stop on any and all golf courses' development in China.[21] Under the State Council's notice, as of January 10, 2004, no new golf courses could be approved; and projects that had been approved but yet to be built, were not allowed to continue.[22]

Another example would be the Beijing Municipal Land and Resources Bureau announced at a press conference in August 2005 that it would stop the supply of land for commercial development inside the Second Ring Road fueling sentiment for further price growth.

Investors must know that while presenting many opportunities, China also has many uncertainties in its investing environment.

(h)     Dispute Resolution. The Chinese Draft Property Law and other laws that govern real estate business are very complicated and sometimes contradictory. Practice frequently involves many areas of laws such foreign investment, financing, banking, securities, and foreign exchange regulations. Policies on real estate control changing from time to time and few judges have expertise in real estate law. Given these factors and resulting uncertainty in real estate litigation, it is recommended that investors should choose arbitration to resolve their disputes.

(i)     General risks associated with investment in real estate. As investing in any real estate marketplace, investors are facing risks such as market fluctuation, supply demand unbalance, property depreciation, environmental disasters, war etc. while they are in China.

---

[20] Article 4 of the *Provisional Measures of Foreign Investment Enterprises Foreign Exchange Management*.
[21] *Guobanfa [2004] No. 1*.
[22] *Guobanfa [2004] No. 1*

Case: 18-04060     Doc# 47-16     Filed: 02/04/19     Entered: 02/04/19 06:37:11     Page 22 of 28

## II.    QUALIFICATIONS

Notwithstanding any provision in this Opinion Letter to the contrary, the foregoing opinions are subject to the following additional qualifications:

3.1    <u>Assumptions</u>.  In rendering the foregoing opinions, we have relied, without investigation, upon the assumptions set forth below unless in a given case the particular assumption states, directly or in practical effect, a legal conclusion expressed in the opinion:

(a)    All natural persons who are involved on behalf of the Client, have sufficient legal capacity to enter into and perform the Transaction or to carry out their role in it.

(b)    Each document submitted to us for review is accurate and complete, each such document that is an original is authentic, each such document that is a copy conforms to an authentic original, and all signatures on each such document are genuine.

(c)    Each Public Authority Document is accurate, complete, and authentic and all official public records (including their proper indexing and filing) are accurate and complete.

(d)    There has not been any mutual mistake of fact or misunderstanding, fraud, duress or undue influence.

(e)    The conduct of the parties to the Project has complied with any requirement of good faith, fair dealing and conscionability.

(f)    There are no agreements or understandings among the parties, written or oral, and there is no usage of trade or course of prior dealing among the parties that would, in either case, define, supplement or qualify the terms of the Documents.

(g)    All statutes, judicial and administrative decisions, and rules and regulations of governmental agencies, constituting the Law of the Opining Jurisdiction are generally available (i.e., in terms of access and distribution following publication or other release) to lawyers practicing in the Opining Jurisdiction, and are in a format that makes legal research reasonably feasible.

(h)    The constitutionality or validity of a relevant statute, rule, regulation or agency action is not in issue unless a reported decision in the Opining Jurisdiction has specifically addressed but not resolved, or has established, its unconstitutionality or invalidity.

(i)    **Other Agreements** and **Court Orders** (as such terms are defined in the attached Glossary) would be enforced as written.

(j)     The Client will not in the future take any discretionary action (including a decision not to act) permitted under the Documents Reviewed that would result in a violation of law or constitute a breach or default under any Other Agreement or Court Order.

(k)     The Client will obtain all permits and governmental approvals required in the future, and take all actions similarly required, relevant to subsequent consummation of the Transaction or performance of the Transaction Documents.

(l)     All parties to the Project will act in accordance with, and will refrain from taking any action that is forbidden by, the terms and conditions of the Transaction Documents.

(m)     The relevant documents have been or will be duly recorded and/or filed in all places necessary (*if* and to the extent necessary) to create the lien as provided therein.

We have no Actual Knowledge that the foregoing assumptions are false. We have no Actual Knowledge of facts that, under the circumstances, would make our reliance on the foregoing assumptions unreasonable.

3.2    <u>Exclusions</u>. None of the foregoing opinions include any implied opinion unless such implied opinion is both (i) essential to the legal conclusion reached by the express opinions set forth above and (ii) based upon prevailing norms and expectations among experienced lawyers in the State, reasonable in the circumstances. Moreover, unless explicitly addressed in this Opinion Letter, the foregoing opinions do not address any of the following legal issues, and we specifically express no opinion with respect thereto:

(a)     Federal securities laws and regulations administered by the Securities and Exchange Commission (other than the Public Utility Holding Company Act of 1935), state "Blue Sky" laws and regulations, and laws and regulations relating to commodity (and other) futures and indices and other similar instruments;

(b)     Federal Reserve Board margin regulations;

(c)     Pension and employee benefit laws and regulations (*e.g.*, ERISA);

(d)     Federal and state antitrust and unfair competition laws and regulations;

(e)     Federal and state laws and regulations concerning filing and notice requirements, other than requirements applicable to charter-related documents such as a certificate of merger;

(f)     Compliance with fiduciary duty requirements;

Case: 18-04060   Doc# 47-16   Filed: 02/04/19   Entered: 02/04/19 06:37:11   Page 24 of 28

(g)   Local Law;

(h)   The characterization of the Project as one involving the creation of a lien on Real Property or a security interest in Personal Property except to the extent that the enforceability of remedies against the Client set forth in the Documents Reviewed is dependent on the characterization of the Project expressed by the parties to it;

(i)   Fraudulent transfer and fraudulent conveyance laws;

(j)   Federal and state environmental laws and regulations;

(k)   Federal and state land use and subdivision laws and regulations;

(l)   Federal and state tax laws and regulations;

(m)   Federal patent, copyright and trademark, state trademark, and other Federal and state intellectual property laws and regulations;

(n)   Federal and state racketeering laws and regulations (*e.g.*, RICO);

(n)   Federal and state health and safety laws and regulations (*e.g.*, OSHA);

(p)   Federal and state labor laws and regulations;

(q)   Federal and state laws, regulations and policies concerning (i) national and local emergency, (ii) possible judicial deference to acts of sovereign states, and (iii) criminal and civil forfeiture laws;

(r)   Other Federal and state statutes of general application to the extent they provide for criminal prosecution (*e.g.*, mail fraud and wire fraud statutes);

(s)   Chinese State or local tax laws; and

(t)   Any other matters that are not addressed and given opinion by the Opinion Giver explicitly within this Opinion under California law, Delaware Corporations Law, Chinese law or laws of any other jurisdiction.

3.5   <u>Choice of Law</u>.  The opinion set forth in this Opinion Letter is given as if the Law of the Opining Jurisdiction governs each document listed in Section 1.1, without regard to whether the those documents so provides, and without regard to any choice of law rules except as provided below in this Paragraph.  While the preceding sentence excludes any opinion on the effectiveness of any governing law provision in the reviewed documents, if a Reviewed Document contains a governing law provision choosing the Law of the Opining Jurisdiction to govern the contract, the opinion set forth in this Opinion Letter includes an opinion (subject to the other qualifications in this Part III) that such governing law provision choosing the Law of the Opining Jurisdiction will be given effect under the choice of law rules of the Opining Jurisdiction; however, the opinion set forth in this Opinion Letter does not include an opinion as

Case: 18-04060   Doc# 47-16   Filed: 02/04/19   Entered: 02/04/19 06:37:11   Page 25 of 28

to what Law governs (i) if the reviewed document contains a governing law provision choosing the Law of an **Other Jurisdiction** (as defined in the attached Glossary) or does not contain a governing law provision, or (ii) to the extent the opinion as to what Law governs requires a determination that the Law of the Opining Jurisdiction is not contrary to a fundamental policy of the Law of an Other Jurisdiction.

## IV. USE OF THIS OPINION

4.1     The opinions expressed in this Opinion are solely for Client's use in connection with the Project for the purposes contemplated by the investors.  Without our prior written consent, this Opinion may not be used or relied upon by Client for any other purpose whatsoever, except for the use of this Opinion (i) in connection with review of the Project by a regulatory agency having supervisory authority over Client for the purpose of confirming the existence of this Opinion, (ii) in connection with the assertion of a defense as to which this Opinion is relevant and necessary, or (iii) in response to a court order.

Very truly yours,

Y. Natalie Zhang
Attorney at Law
U.S.–China Counsel

14

# GLOSSARY

As used in the Opinion Letter to which this Glossary is attached, except as otherwise defined in such Opinion Letter, the following terms (whether used in the singular or the plural) shall have the meanings indicated:

Actual Knowledge: with respect to the Opinion Giver, the conscious awareness of facts or other information by the attorney(s) at U.S.-China Counsel.

Client: the party or parties to the Transaction (including predecessor entities where relevant) for which the Opinion Giver provides legal representation.

Collateral: collectively or individually, all Real Property described in the Security Documents and all Personal Property described in the Security Documents, in respect of which provision is made by the Security Documents for a lien or security interest, unless a different meaning is given in the Reviewed Documents.

Constituent Documents: the articles or certificate of incorporation, by-laws, partnership documentation or similar organization documents of the Client.

Court Orders: court and administrative orders, writs, judgments and decrees that name the Client and are specifically directed to it or its property.

Law: the statutes, the judicial and administrative decisions, and the rules and regulations of the governmental agencies of the Opining Jurisdiction, including its Local Law (but subject to any limitations on coverage of Local Law set forth in the Opinion Letter to which this Glossary is attached).

Local Law: the statutes and ordinances, the administrative decisions, and the rules and regulations of counties, towns, municipalities and special political subdivisions (whether created or enabled through legislative action at the Federal, state or regional level -- *e.g.*, water agencies, joint power districts, the Maine Turnpike Authority, The Southern California Rapid Transit District, the Port Authority of New York and New Jersey), and judicial decisions to the extent that they deal with any of the foregoing.

Opining Jurisdiction: a jurisdiction whose applicable Law is addressed by the Opinion Giver in the Opinion; if there is more than one such jurisdiction (*e.g.*, the United States and a particular state), the term refers collectively to all.

Opinion: a legal opinion that is rendered by the Opinion Giver to one or more persons involved in the Transaction other than the Client.

Opinion Giver: the lawyer or legal organization rendering the Opinion.

Opinion Letter: the document setting forth the Opinion that is delivered to and accepted by the Opinion Recipient.

Case: 18-04060    Doc# 47-16    Filed: 02/04/19    Entered: 02/04/19 06:37:11    Page 27 of 28

<u>Opinion Recipient</u>:  the addressee or addressees of the Opinion.

<u>Other Agreements</u>:  contracts, other than the Transaction Documents, to which the Client is a party or by which it or its property is bound.

<u>Other Counsel</u>:  a lawyer or legal organization (other than the Opinion Giver) providing a legal opinion pertaining to particular matters concerning the Client, the Transaction Documents or the Transaction (i) directly to the Opinion Recipient, or (ii) to the Opinion Giver in support of the Opinion.

<u>Other Jurisdiction</u>:  the jurisdiction whose law a Transaction Document provides will govern that contract, if not the Opining Jurisdiction.

<u>Personal Property</u>:  property or rights and interests in property treated under Law as personalty or otherwise not as Real Property.

<u>Primary Lawyer</u>:

    (a)    the lawyer in the Opinion Giver's organization who signs the Opinion;

    (b)    any lawyer in the Opinion Giver's organization who has active involvement in negotiating the Transaction, preparing the Transaction Documents or preparing the Opinion; and

    (c)    solely as to information relevant to a particular opinion issue or confirmation regarding a particular factual matter (*e.g.,* pending or threatened legal proceedings), any lawyer in the Opinion Giver's organization who is primarily responsible for providing the response concerning that particular opinion issue or confirmation.

<u>Public Authority Documents</u>:  certificates issued by the Secretary of State or any other government official, office or agency concerning a person's property or status, such as certificates of corporate or partnership good standing, certificates concerning tax status, certificates concerning Uniform Commercial Code filings or certificates concerning title registration or ownership.

<u>Real Property</u>:  property or rights and interests in property treated under Law as real property, including fixtures.

Case: 18-04060    Doc# 47-16    Filed: 02/04/19    Entered: 02/04/19 06:37:11    Page 28 of 28